2019 IL App (1st) 180439

THIRD DIVISION
May 22, 2019

No. 1-18-0439

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| MERCURY SIGHTSEEING BOATS, INC., and MERCURY SKYLINE YACHT CHARTERS, INC., | ) ) | |
| | ) | Appeal from the Circuit Court of |
| Plaintiffs-Appellants, | ) | Cook County. |
| | ) | |
| v. | ) | Nos.    16 CH 10775 and |
| | ) | 16 L 50566, cons. |
| THE COUNTY OF COOK, THE COOK COUNTY | ) | |
| DEPARTMENT OF REVENUE, and THE COOK | ) | Honorable Daniel J. Kubasiak, |
| COUNTY DEPARTMENT OF ADMINISTRATIVE | ) | Judge Presiding |
| HEARINGS, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    After defendant, the Cook County Department of Revenue (DOR), assessed a tax against plaintiffs, Mercury Sightseeing Boats, Inc., and Mercury Skyline Yacht Carriers, Inc. (collectively, Mercury), Mercury's attorney contacted DOR to confirm the deadline to file a protest. The DOR auditor assigned to the matter told Mercury it had 20 days from the date Mercury received the notice, which the auditor equated to October 1, 2014.

¶ 2    Not so, as it turned out: Mercury's deadline was September 29. But Mercury followed DOR's advice and filed its protest on October 1.

¶ 3    Nothing was said of this until the administrative law judge (ALJ) assigned to the protest hearing pointed it out to the parties. But the ALJ ruled that DOR had forfeited any timeliness objection and proceeded to the merits of the matter, ultimately ruling in favor of Mercury.

¶ 4    The trial court, on administrative review, likewise found that Mercury had blown the 20-day deadline but, unlike the ALJ, determined that the deadline was "jurisdictional" in nature and thus could not be forfeited. So without considering the merits of the final administrative decision, the trial court reversed and ordered that judgment be entered in DOR's favor.

¶ 5    We agree with the trial court that the 20-day time limitation was "jurisdictional," in that it was a limitation on the administrative body's authority to hear protests. As this protest was not filed within the 20-day window, the administrative body lacked authority to hear it. But we hold that DOR violated the procedural due process rights of Mercury by affirmatively misleading Mercury, if unintentionally, on the proper deadline for filing. The proper remedy for that constitutional violation is to allow Mercury its hearing on the merits. We thus vacate the trial court's ruling and remand for a consideration of that administrative decision on the merits.

¶ 6                                    BACKGROUND

¶ 7    Mercury was founded in the 1930s by a Portuguese immigrant named Arthur Agra. Since that time, Mercury has continued to operate as a family business, running a fleet of ubiquitous boats that provide, among other things, educational architecture tours along the Chicago River and Lake Michigan.

¶ 8    In 1996, Cook County enacted an amusement tax (Amusement Tax) that imposed against "patrons of every amusement" a 3% tax on the admission fee paid "for the privilege to enter, to

witness or to view such amusement." Cook County Code of Ordinances § 74-392(a) (approved Nov. 22, 1996) (Code). From 1996 until 2014, DOR never assessed the Amusement Tax against Mercury. In fact, in an October 6, 2000, letter from then director of revenue to an unspecified recipient, DOR stated, "it has been and still is the County's position that both sightseeing cruises and water taxi services are not amusements as defined in the Ordinance and, therefore, are not subject to the tax."

¶ 9     In 2014, DOR shifted course. In July of that year, a DOR auditor initiated a tax discovery investigation of Mercury to "verify [its] compliance with the Cook County Amusement Tax." The auditor ultimately determined that, notwithstanding DOR's prior position, it now determined "that the Amusement tax applies to operators of tour boats, trolley tours, etc." In August 2014, on multiple occasions, the auditor contacted Mercury and demanded that it register to collect the tax and remit payment for taxes due for May and June 2014.

¶ 10    Afterwards, Mercury and DOR participated in two phone conferences. During the first call, Mercury requested time to review DOR's assessments. At the second conference, Mercury expressed its belief that, as applied to Mercury, the tax was preempted by federal law.

¶ 11    DOR responded by issuing an "Amusement Tax Delinquency Notice of Jeopardy Tax Determination and Assessment" to Mercury. The notice was dated September 9, 2014. At the bottom of the page was a stamp that read in all caps and bold: "MAILED SEP 09 2014." It is undisputed that Mercury did not receive this notice until September 11, 2014.

¶ 12    This notice advised Mercury that it had "not remitted the tax due for the period(s) below," namely May through July 2014. It requested that Mercury remit payment by September 26, 2014, and that interest would continue to accrue until the liability was paid in full. It advised Mercury that if it believed that its tax liability was different than as indicated on the notice, it

could complete the form on the reverse side of the notice along with supporting documentation. The notice further advised Mercury that if payment was not received by September 26, 2014, DOR would "schedule an Administrative Hearing and refer the matter to a collection agency."

¶ 13    On September 17, in response to a request by Mercury, the DOR auditor e-mailed Mercury a form titled "Protest and Petition for Hearing." By all appearances, it was a standard form to be filled out by taxpayers seeking to file a protest. It provided that the protestor (who was required to fill in its name and address) "hereby protests its assessment for (fill in the tax type) concerning the following periods: (fill in relevant time period) and hereby files a petition for hearing on these matters." It goes on to read:

> "The petitioner's notice of the County's tax determination and assessment in the amount of $_____ was delivered/mailed on _____, and as such Petitioner hereby files this petition within twenty days thereof pursuant to SECTION 34A of the Uniform Penalties, Interest and Procedures Ordinance of Cook County. State the reasons for the protest below. ***"

¶ 14    On September 23, 2014, Mercury's attorney sent the auditor an e-mail stating, "Please confirm the due date for the protests, based on our receipt on September 11, the due date would be October 1, 2014. Please confirm[.]" On September 24, the auditor responded, stating:

> "That is correct.
>
> The taxpayer receiving an assessment has 20 days from the date of receipt to file a protest and petition for hearing. Your receipt date was September 11, 2014. *Thus, the due date to file the protest is October 1, 2014.*" (Emphasis in original.)

¶ 15    On October 1, Mercury filed its protest. In response, DOR forwarded Mercury's protest to the Cook County Department of Administrative Hearings (DOAH), Cook County's administrative body for hearing such protests. DOAH then scheduled a hearing.

¶ 16    Mercury raised four arguments before DOAH: (1) its architecture boat tours and sightseeing cruises were not "amusements" as defined in the Code and thus were not subject to the tax; (2) even if they were "amusements," they were exempt from the tax as "live cultural performance[s]"; (3) as applied to Mercury, the amusement tax was preempted by 33 U.S.C. § 5(b) (2012); and (4) applying the tax to Mercury would violate the equal protection clause of the fourteenth amendment and the uniformity clause of the Illinois Constitution.

¶ 17    On July 6, 2015, DOR filed its response to Mercury's protest. DOR contested each of Mercury's arguments but never argued or suggested that Mercury's protest was untimely.

¶ 18    On July 19, 2016, the ALJ issued an opinion and decision. The ALJ ruled that, as applied to Mercury, the amusement tax was preempted by 33 U.S.C. § 5(b) (2012). In the course of its ruling, the ALJ *sua sponte* noted that Mercury's protest was not timely filed under section 34-80(a) of the Code (Cook County Code of Ordinances § 34-80(a) (approved Feb. 16, 2011)), but it ruled that DOR forfeited any timeliness argument by failing to raise it at the hearing.

¶ 19    On August 16, 2016, DOR filed a complaint for administrative review in the circuit court. In its complaint, DOR argued for the first time that Mercury's protest was untimely, and thus DOAH lacked jurisdiction to hear the petition.

¶ 20    The circuit court ruled that Mercury's protest was untimely under section 34-80(a). More importantly, the court found that the 20-day deadline in section 34-80(a) was jurisdictional, which meant that the deadline was not subject to forfeiture. As a result, the court held that

DOAH lacked authority to hold a hearing on Mercury's protest and deemed the ALJ's opinion and decision "void." This timely appeal followed.

¶ 21                                    ANALYSIS

¶ 22    Mercury's principal argument on appeal is a constitutional one—that DOR violated Mercury's right to procedural due process by mistakenly identifying a protest deadline that was later than the actual deadline, thereby lulling Mercury into an untimely filing. While Mercury is free to lead with its constitutional argument, we are not. We must avoid constitutional questions whenever possible and first consider all other arguments. *People v. Alcozer*, 241 Ill. 2d 248, 253 (2011) ("It is well settled that courts should avoid constitutional questions when a case may be decided on other grounds."). So we begin with the nonconstitutional arguments. There are three.

¶ 23                                         I

¶ 24    First, Mercury argues that its protest was timely under what it deems DOR's prior, long-standing interpretation of section 34-80(a)—that a protest was timely under section 34-80(a) if it was filed within 20 days of the taxpayer's *receipt* of the notice. Mercury says we should not accept DOR's newfound interpretation, which it portrays as a convenient, mid-litigation switch.

¶ 25                                         A

¶ 26    As a home-rule unit, Cook County has the constitutional authority both to tax and to tax amusements. See Ill. Const. 1970, art. VII, § 6(a); *City of Chicago v. StubHub, Inc.*, 2011 IL 111127, ¶ 26; *Town of Cicero v. Fox Valley Trotting Club, Inc.*, 65 Ill. 2d 10, 24 (1976). It does so through county ordinances. We interpret Cook County's ordinances under the same principles of construction applicable to statutes. *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 48.

¶ 27    The "cardinal principle" of interpreting an ordinance is to determine the legislature's intent, based on the plain language of that law. *Oswald v. Hamer*, 2018 IL 122203, ¶ 10. If the plain language is unambiguous, we need not resort to other aids of construction, including deference to an agency's interpretation. *People ex rel. Madigan v. Kinzer*, 232 Ill. 2d 179, 184 (2009); *Boaden v. Department of Law Enforcement*, 171 Ill. 2d 230, 239 (1996) ("As we find that the statute is not ambiguous, we decline to defer to the Commission's interpretation."). So before deciding whether we will defer to *any* agency interpretation, we must first determine if deference is warranted at all—that is, if the ordinance at issue is ambiguous.

¶ 28    The relevant provisions of the Code are found in section 34, and more specifically in article III, known as "the Uniform Penalties, Interest and Procedures Ordinance." Cook County Code of Ordinances § 34-60 (approved Feb. 16, 2011). The parties refer to the ordinance as the "UPIP," so we will, too. Section 34-80(a) of the UPIP provides:

> "Any person to whom the Director issues a tax determination and assessment shall be given written notice of the tax determination and assessment along with written demand for payment.
>
> The person named in the tax determination and assessment may file with the Department a written protest and petition for hearing. The written protest and petition must be filed within 20 days of *mailing* the notice of tax determination and assessment by the Department." (Emphasis added.) *Id.* § 34-80(a).

¶ 29    We find nothing ambiguous about that language. Mercury focuses on the word "mailing," but that word is not unclear.  It's hard to imagine that "mailing" could mean anything other than sending a document via U.S. mail. (Or e-mail in some contexts, but e-mail is not relevant here.)

That is certainly how the dictionaries see it, principally defining "mail" as "[t]he postal system" and defining "mailing" as "[t]he action or process of sending something by mail."[1]

¶ 30    And while no literal definition of "mailing" is found in the UPIP, the UPIP considers it to refer to the U.S. mail, too. Section 34-78 of the UPIP provides two methods by which DOR may "give notice" to a taxpayer, one being personal delivery and the other being by "United States registered, certified or first class mail, addressed to the person concerned at the person's last known address." Cook County Code of Ordinances § 34-78(a)(1) (approved Feb. 16, 2011). So there is no denying that the reference to "mailing" in section 34-80(a) can only refer to DOR's act of depositing the notice of tax determination and assessment in the U.S. mail.

¶ 31    We do not agree with Mercury's attempts to inject ambiguity into that term. Mercury notes that some agencies define service as occurring some time after the postmark date, which is true—sometimes agency rules do that. See, *e.g.*, *Moren v. Department of Human Rights*, 338 Ill. App. 3d 906, 909-10 (2003) (department rule presumed notice was received five days after mailing); *State of Illinois Department of Central Management Services v. State of Illinois Labor Relations Board, State Panel*, 373 Ill. App. 3d 242, 248 (2007) (agency rule deemed service completed three days after mailing of notice). But section 34-80 of the UPIP does not. If anything, the fact that section 34-80 does not build in such a grace period, when other agencies have done so, only underscores that the "mailing" itself is the operative moment in this case, not some unspecified amount of time thereafter.

¶ 32    Mercury also points to what it deems an inconsistency in the UPIP regarding filings with DOR. Section 34-79(2), Mercury notes, imposes a "postmark rule" for filings with DOR, by

---

[1] See, respectively, Oxford English Dictionary, https://en.oxforddictionaries.com/definition/mail (last visited April 12, 2019); Oxford English Dictionary, https://en.oxforddictionaries.com/definition/mailing (last visited April 12, 2019).

which a filing is deemed timely if DOR receives it by the due date *or* the filing bears a postmark on or before the time deadline. See Cook County Code of Ordinances § 34-79(2) (approved Feb. 16, 2011). In other words, even if DOR doesn't receive the filing by the deadline, the filing is timely if it was *mailed* by the deadline. (Those who wait until April 15 to mail their state and federal income-tax payments will be familiar with this concept.)

¶ 33    But we see no inconsistency, as the relevant portions of sections 34-79 and 34-80 cover different things. Section 34-79 is a general provision concerning when a filing *with* DOR is deemed timely, giving a grace period to filers who mail the filing by the deadline. That's not our issue. Mercury isn't claiming that it mailed the protest before the deadline, only to have DOR receive it after the deadline. No, Mercury is claiming that the beginning of the 20-day period— the date when *DOR "mailed" its notice to Mercury*—should be tolled until the time that Mercury received it. There is obviously a difference between a provision governing the timing of a taxpayer's filing *with* DOR versus the timing of a taxpayer's receipt of a notice *from* DOR. So the timing of DOR's "mailing" of its notice to Mercury—that is, when the 20-day clock began to run—is not governed by section 34-79. There is no inconsistency and thus no ambiguity.

¶ 34    In any event, even if we could conjure up an inconsistency there, it does not automatically follow that an ambiguity exists. It is not uncommon at all for two statutory provisions to seemingly contradict each other, but when the provisions recognize that fact through the use of phrases such as "notwithstanding any other provision" or "unless otherwise provided for," it becomes clear that the legislature intended exceptions to some general statutory rule, and thus there is no actual contradiction. See, *e.g.*, *Persaud v. Illinois Department of Employment Security*, 2019 IL App (1st) 180964, ¶ 21; *Daniels v. Board of Education of the City of Chicago*, 277 Ill. App. 3d 968, 973 (1996).

¶ 35    Here, section 34-79, embodying the "postmark rule" for taxpayer filings with DOR, begins with the language "[u]nless otherwise provided." It's a general rule, subject to exceptions specified elsewhere in the UPIP. So even if we found an inconsistency between the "postmark rule" in section 34-79 and the interpretation of when DOR "mailed" the notice to Mercury under section 34-80 (which we do not), we would still find no ambiguity, because section 34-80 "provides otherwise" for its mailings of tax determinations to taxpayers.

¶ 36    Finally, Mercury argues that if "mailing" refers only to the actual date of deposit in the mail, "then § 34-80(a) has many gaps," because the Code also permits service by personal delivery, as previously mentioned. See Cook County Code of Ordinances § 34-78(a)(2) (approved Feb. 16, 2011). It's true that section 34-80 requires only that DOR "give[ ] written notice" of the tax determination and assessment. *Id.* § 34-80(a). It doesn't require that this "written notice" be mailed. So under section 34-78(a), that written notice could be served either by U.S. mail or personal delivery. *Id.* § 34-78(a).

¶ 37    Mercury finds a "gap," in that section 34-80(a) provides for a 20-day clock that begins when the notice of tax determination is "mailed" but says nothing about what happens if that notice is personally delivered. The point is well-taken. But what does that get Mercury? It means that there is an ambiguity in section 34-80(a) regarding the protest deadline when a taxpayer receives *personal delivery* of a notice of tax determination. That's not what happened here. So Mercury is merely pointing out an ambiguity in the ordinance that has nothing to do with a taxpayer that, like Mercury, received the notice via U.S. mail. In other words, it's an ambiguity, but not one that is relevant to this case. For our purposes, section 34-80(a) is *not* ambiguous on when the 20-day clock starts for recipients of *mailed* notices—it begins on the date the notice is deposited in the U.S. mail.

¶ 38    Because we find no ambiguity in section 34-80(a)'s reference to DOR's mailed notice, it is unnecessary to defer to any interpretation DOR placed on it, be it a long-standing interpretation or a new one. Mercury's 20-day window to file a protest began to run on the day that DOR mailed its notice of tax determination and assessment to Mercury, not when Mercury received it.

¶ 39                                    B

¶ 40    Thus far in our analysis of section 34-80(a), we have indulged Mercury's argument that DOR has suddenly, mid-litigation, switched its long-standing interpretation of the protest deadline in section 34-80(a). It made no difference to our analysis, because in light of the unambiguous nature of the term "mailing," we found no need to defer to DOR's interpretation. But it's worth clarifying that we don't think DOR has changed its "longstanding" position at all.

¶ 41    Mercury cites several instances in the past when, it says, DOR took the position that a "protest would be timely if it was filed within 20 days of *either* the postmark date or the receipt." (Emphasis added.) But that doesn't present the full picture.

¶ 42    As we just discussed above, at Mercury's prompting no less, the UPIP provides two different methods by which DOR may serve a taxpayer with a notice of tax determination and assessment—by personal delivery or U.S. mail. See *id.* We have made it clear by now that the commencement of the protest deadline for notices served by U.S. mail is clear and unambiguous in section 34-80(a)—it is the date of the "mailing" of the notice. *Id.* § 34-80(a). And we just agreed with Mercury above that section 34-80(a) is silent as to how to compute the 20-day protest window for notices received via personal delivery.

¶ 43    It is clear, then, that when it comes to notices that were "mailed," DOR has taken the position that the "postmark date"—that is, the date of "mailing"—is the triggering event for the

11

20-day window. And for notices that were personally delivered, DOR has interpreted the date of "receipt" or "delivery" as the operative trigger of the 20-day deadline under section 34-80(a). (Which makes sense, as a personally delivered document is typically received the same day it's sent, so "receipt" or "delivery" (in this context, synonyms) is about the only possible triggering moment that DOR *could* adopt.)

¶ 44   Viewed as such, it does not appear that DOR has changed its "longstanding" interpretation at all: for "mailed" notices, the 20-day clock starts on the date of mailing; for personally delivered notices, it starts on the date of receipt or delivery.

¶ 45   The past instances that Mercury cites do not show otherwise; indeed, they prove the point. Mercury cites a notice DOR sent in 2013, advising a taxpayer that they must file their protest "WITHIN TWENTY DAYS OF THE RECEIPT OF THIS NOTICE *OR* WITHIN TWENTY DAYS OF THE DATE OF THE MAILING OF THIS NOTICE." (Emphasis in original.) But what Mercury fails to mention is that there were small boxes next to each of those options for the DOR official to place a checkmark or an "x" next to one or the other—depending, quite obviously, on whether the notice was personally delivered or sent by U.S. mail. If it was personally delivered, the first box should be checked; for mailed notices, the second box.

¶ 46   This document was redacted in several places such that we can't tell which mode of service was used. And the DOR official, for what it's worth, didn't check either box. But that doesn't change the fact that this form notice from 2013 was clearly intended to cover both possibilities and to provide specific guidance on how to calculate the protest deadline, depending on which mode of service was employed.

¶ 47   "By 2015," Mercury tells us, "DOR did not even mention the postmark date in its notices to taxpayers," instructing them "that they have '20 days from the date o[f] your receipt of this

letter to file a protest.' " For that rather broad pronouncement, Mercury cites a grand total of one notice from 2015 from DOR to some taxpayer, name redacted. But we have no way of knowing from that notice whether it was personally served or mailed—either the letter didn't specify or it's buried under the redactions. And that fact is critical, of course, because if that notice was *personally delivered*, then DOR was acting perfectly consistently with its "longstanding" (and current) interpretation by telling the taxpayer that the date of "receipt" started the 20-day clock.

¶ 48    Last, Mercury cites the standard protest form that DOR gives taxpayers to file protests. It's the very one DOR gave Mercury in this case. It's also available online, still today.[2]

¶ 49    In that protest form, the taxpayer fills out the following:

"The petitioner's notice of the County's tax determination and assessment in the amount of $_____ was delivered/mailed on _____, and as such Petitioner hereby files this petition within twenty days thereof ***." *Id.*

¶ 50    Again, this form underscores that DOR is accounting for two different possible triggering dates—the date the notice was "delivered" if by personal delivery, or the date it was "mailed" if sent by U.S. mail. This form is not a model of draftsmanship, and we will have more to say about it later, but the salient point here is that this form does not prove that DOR has shifted its position over time—it shows that its interpretation has remained consistent.

¶ 51    So even if we were wrong when we found section 34-80(a) unambiguous as to when the 20-day protest clock begins for tax notices sent by U.S. mail, and it became necessary to consider the agency's interpretation, we would not be forced to choose between DOR's previous, "longstanding" interpretation and its current one. They are one and the same. From the minimal record we have, at least, DOR has always interpreted the date of "mailing" to be the date the 20-

---

[2] See Cook Cty. Dep't of Revenue, Protest and Petition for Hearing, https://www.cookcountyil.gov/sites/default/ files/protest_and_petition_for_hearing_form.pdf (last visited May 3, 2019) [https://perma.cc/X45U-9BXL].

day protest window opens for notices of tax determination sent via U.S. mail. That is unquestionably a reasonable interpretation of section 34-80(a), and thus we would adopt it.

¶ 52                                                           II

¶ 53   Next, Mercury says DOR forfeited any argument that Mercury's protest was untimely by failing to raise that objection before the DOAH. Mercury claims the 20-day deadline in section 34-80(a) sets forth a statute of limitations that may be forfeited, rather than a mandatory deadline that, if not met, deprived the DOAH of jurisdiction to hear Mercury's petition.

¶ 54                                                           A

¶ 55   When we speak of an administrative agency's "jurisdiction," we mean its authority to act. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 243 (1989) ("The term 'jurisdiction,' while not strictly applicable to an administrative body, may be employed to designate the authority of the administrative body to act ***." (Internal quotation marks omitted.)). Agencies have no inherent or common-law power; they are creatures of statute that have only the power that their legislative creators gave them. *Robinson v. Human Rights Comm'n*, 201 Ill. App. 3d 722, 728 (1990). So when "an agency acts outside its statutory authority," we often say that the agency "acts without jurisdiction." *Business & Professional People*, 136 Ill. 2d at 243.

¶ 56   Because the statutory language places limits on the agency's authority, "parties seeking review of an agency decision must 'strictly comply' with the procedures set forth in the statute or ordinance." *Modrytzkji v. City of Chicago*, 2015 IL App (1st) 141874, ¶ 10 (quoting *Collinsville Community Unit School District No. 10 v. Regional Board of School Trustees of St. Clair County*, 218 Ill. 2d 175, 182 (2006)). Thus, Illinois courts have " 'consistently held that time limitations upon bringing actions before administrative agencies are matters of jurisdiction which

cannot be tolled.' " *Austin Gardens, LLC v. City of Chicago Department of Administrative Hearings*, 2018 IL App (1st) 163120, ¶ 21 (quoting *Modrytzkji*, 2015 IL App (1st) 141874, ¶ 13).

¶ 57    For example, in *Austin Gardens*, 2018 IL App (1st) 163120, ¶ 3, the plaintiff was served with a citation alleging building-code violations at its property in Chicago. After the plaintiff failed to appear for a hearing before Chicago's department of administrative hearings, an ALJ entered a default judgment for the city. *Id.* ¶ 5. The default judgment was mailed to the plaintiff and provided that the plaintiff had 21 days from the mailing date of the notice to move to vacate the order of default. *Id.* The plaintiff filed its motion well beyond that 21-day deadline, and the ALJ denied it. *Id.* ¶ 7.

¶ 58    On administrative review, we held that the department lacked the authority to hear the plaintiff's motion, as it was filed beyond the 21-day window provided within the Chicago Municipal Code. The deadline was jurisdictional, because it "set limits on when parties must act in order to obtain review" from the department of administrative hearings. *Id.* ¶ 23. We likewise rejected the plaintiff's argument that the city forfeited its timeliness objection by failing to raise it at the administrative level, as "[a] challenge to an agency's jurisdiction 'can be raised at any time,' including on appeal." *Id.* ¶ 17 (quoting *Modrytzkji*, 2015 IL App (1st) 141874, ¶ 9).

¶ 59    Likewise, in *Modrytzkji*, 2015 IL App (1st) 141874, ¶¶ 1, 11, Chicago's animal-control commission notified the plaintiff that his dogs were "dangerous animals" under the Chicago Municipal Code and advised him that he had seven days to protest the determination. The plaintiff filed a protest well after that seven days; the department of administrative hearings heard it, anyway, and ruled in favor of the commission. *Id.* ¶ 6. The plaintiff sought administrative review.

¶ 60     We held that the department of administrative hearings lacked jurisdiction to conduct the hearing, as the request for the hearing fell outside the seven-day period. *Id.* ¶ 14. We reasoned that "[b]ecause the Department only has limited statutory authority, its powers cannot be expanded beyond what is authorized by the Chicago Municipal Code," and we found "nothing in the Chicago Municipal Code that authorizes the Department to conduct hearings when a request for a hearing is untimely." *Id.* ¶ 12. Given the untimely request, the department "did not have authority" to conduct the hearing in the first instance. *Id.* ¶ 14. We also noted that the city had failed to raise this jurisdictional argument in the circuit court but held that the jurisdictional argument was not subject to forfeiture and could be raised at any time. *Id.* ¶ 9.

¶ 61     The same result obtains here. Like any other administrative agency, DOAH has only that power granted it by Cook County ordinance. Section 34-80(a) of the UPIP allows DOAH to hear only those protests initiated within the 20-day deadline. DOAH thus lacked any authority to hear a protest initiated in an untimely manner. The deadline is jurisdictional in nature, and it was thus not subject to forfeiture. *Austin Gardens*, 2018 IL App (1st) 163120, ¶ 23; *Modrytzkji*, 2015 IL App (1st) 141874, ¶ 12; see also *El Sauz, Inc. v. Daley*, 328 Ill. App. 3d 508, 515 (2002) (provision in liquor-control statute, providing 20 days in which to seek rehearing of commission decision, was jurisdictional deadline); *In re Abandonment of Wells Located in Illinois*, 343 Ill. App. 3d 303, 307 (2003) (giving of proper notice of agency action and administrative hearing were "jurisdictional prerequisites" for agency "to have the authority to hear the case").

¶ 62                                          B

¶ 63     Mercury approaches the issue from another angle altogether. It says section 34-80(a) is not a "jurisdictional" limitation but rather a mere statute of limitations, subject to forfeiture. As such, DOR could have forfeited and did, in fact, forfeit any timeliness objection.

¶ 64    The argument goes like this: (1) a limitations period is jurisdictional in nature if the statute created the right being vindicated in the first place, and thus any time limitation in the statute is part and parcel of the very right itself; (2) but if the right previously existed at the common law, then the statute did *not* create the right and merely provides a procedural vehicle for the exercise of that pre-existing right—and in that instance, a limitations period contained within that statute is *not* jurisdictional and *is* subject to forfeiture; (3) the right to contest an "unauthorized" tax, as Mercury claims is the case here, existed at the common law; and thus, (4) the limitations period in section 34-80 is not jurisdictional in nature but is merely a procedural impediment to Mercury's right to challenge an unauthorized tax, subject to forfeiture.

¶ 65    Mercury is correct that Illinois courts recognize a distinction between statutes of limitations and jurisdictional deadlines. When the right a party seeks to vindicate is based on a statute and not the common law, then the statute defines that right, and any statutory time limitation for asserting that right is an inherent element of the right itself. *Fredman Brothers Furniture Co. v. Department of Revenue*, 109 Ill. 2d 202, 209 (1985); *Smith v. Toman*, 368 Ill. 414, 420 (1938). The right does not exist absent compliance with that statutory deadline, and thus the deadline is considered "jurisdictional." *Fredman Brothers*, 109 Ill. 2d at 210. And a jurisdictional objection of this sort, as we have already noted, is not subject to forfeiture.

¶ 66    On the other hand, if the right a party asserts is a common-law right, then a statutory limitations period merely "fix[es] the time within which the remedy for a particular wrong may be sought." *Id.* at 209. It is "procedural" in nature and does not "alter substantive rights," relating instead only to the remedy. *Wilson v. Bishop*, 82 Ill. 2d 364, 373 (1980). Lack of compliance with such a limitations period is thus an affirmative defense subject to forfeiture. *McRaith v. BDO Seidman, LLP*, 391 Ill. App. 3d 565, 584 (2009).

¶ 67    Mercury is also correct that the right to challenge the collection of "unauthorized" taxes long existed at the common law. See *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 281, 301 (2010). As such, for several decades, our supreme court held that a taxpayer seeking to challenge an "unauthorized" tax (as Mercury does here) could proceed straight to court to vindicate that common-law right, notwithstanding its failure to exhaust any administrative remedy that may have existed. See *Owens-Illinois Glass Co. v. McKibbin*, 385 Ill. 245, 256 (1943) ("where a tax is unauthorized by law, or where it is levied upon property exempt from taxation, equity will take jurisdiction and enjoin the collection of the tax").

¶ 68    But all of that changed in 1975, when our supreme court severely curtailed the *Owens-Illinois* "unauthorized by law" exception to the exhaustion requirement. In *Illinois Bell Telephone Co. v. Allphin*, 60 Ill. 2d 350, 359 (1975), the supreme court held that, if an administrative remedy is provided for a particular "unauthorized tax" challenge, and if review of that administrative action is governed by the Administrative Review Law, then a taxpayer is required to proceed via that administrative route and may not rely on a claimed common-law right to go straight to court. See *Houlihan*, 241 Ill. 2d at 301-02 (*Allphin* "held that the *Owens-Illinois* exception would no longer be applicable to situations covered by the Administrative Review Law"); *Christian Action Ministry v. Department of Local Government Affairs*, 74 Ill. 2d 51, 59-60 (1978) (*Allphin* "eliminated the *Owens* doctrine" and provided that exhaustion of administrative remedies is required "where administrative relief is available"); *Carle Foundation v. Department of Revenue*, 396 Ill. App. 3d 329, 340 (2009) ("under *Allphin*, if a taxpayer could contest the denial of an exemption by litigating under the Administrative Review Law, the taxpayer had to take that route rather than petition for an injunction").

¶ 69    All of this means that, as long as (1) an administrative remedy is available to a taxpayer challenging an "unauthorized tax" and (2) that administrative proceeding is subject to the Administrative Review Law, the tax challenge *must* be raised administratively. The taxpayer has no common-law right to otherwise raise that specific challenge to that tax; the statute or ordinance governing that administrative proceeding represents and defines the taxpayer's sole right to relief. So it follows that the taxpayer must strict comply with any timing requirements in the statute or ordinance providing that administrative remedy, else it lose the right altogether.

¶ 70    It won't always be the case that an administrative remedy is provided for the taxpayer—it will depend on the specific argument being raised against the "unauthorized" tax. If no such administrative remedy is provided, the "unauthorized by law" exception will still apply, and the taxpayer retains a common-law right to go straight to court for its challenge. See, *e.g.*, *Houlihan*, 241 Ill. 2d at 302 (statute did not authorize agency to hear claim that taxpayer's property should not have been assessed at all; statute only provided administrative hearings for property that was "overassessed, underassessed, or exempt," and thus taxpayer retained common-law right to mount direct court challenge (internal quotation marks omitted)); *Carle Foundation*, 396 Ill. App. 3d at 340 (taxpayer retained common-law right to challenge "unauthorized" tax directly in court, as statute specifically provided for direct court challenge, not administrative route, for that particular exemption claim).

¶ 71    Indeed, the UPIP itself gives an example. Section 34-81(a) provides that, while protests of taxes may be heard by DOAH, DOAH may *not* entertain facial constitutional challenges or claims that the County Board lacked the authority to adopt the ordinance. Cook County Code of Ordinances § 34-81(a) (approved Feb. 16, 2011). So no administrative route is provided for those

19

particular challenges to an "unauthorized" tax. *Allphin* would not deny a taxpayer its common-law right to assert those specific claims directly in court. See *Houlihan*, 241 Ill. 2d at 301-02.

¶ 72    But Mercury raises neither of those claims. So its challenge falls within section 34-81(a)'s general provision for an administrative hearing for tax protests. See Cook County Code of Ordinances § 34-81(a) (approved Feb. 16, 2011). Aside from facial constitutional challenges and challenges to Cook County's authority to adopt the tax ordinance, section 34-81(a) provides that:

> "When a taxpayer or tax collector files a timely written protest and petition for hearing, the Director shall refer the case to [DOAH] who shall conduct the hearing. The hearing officer is authorized to conduct hearings concerning any matter covered by this article or any tax ordinance administered by the Department and may determine the factual and legal matters raised by the parties to the hearing." *Id.*

¶ 73    Mercury can hardly deny that this administrative route was available. It availed itself of this process and, indeed, prevailed before DOAH.

¶ 74    Likewise, the authorizing ordinance will not always expressly adopt the Administrative Review Law for judicial review of these administrative proceedings, in which case, again, the "unauthorized by law" exception in *Owens-Illinois* still applies, and the taxpayer retains a common-law right to challenge the tax. See, *e.g.*, *Houlihan*, 241 Ill. 2d at 303 (statute did not adopt Administrative Review Law for decisions of board of review). But here, the Code expressly adopted the Administrative Review Law. Section 2-917 of the Code states that all "final decision[s]" issued by DOAH "shall be subject to review under the Illinois Administrative Review Law." Cook County Code of Ordinances § 2-917 (approved Dec. 3, 2008).

¶ 75    In sum, because the Code (1) provided Mercury an administrative forum to raise its specific challenges to the allegedly "unauthorized" tax and (2) adopted the Administrative Review Law to govern judicial review of those administrative procedures, the UPIP provided the sole basis for Mercury's right to protest the Amusement Tax. See *Allphin*, 60 Ill. 2d at 359; *Houlihan*, 241 Ill. 2d at 301-02; *Christian Action Ministry*, 74 Ill. 2d at 59-60; *Carle Foundation*, 396 Ill. App. 3d at 340. Any right existing under the common law fell by the wayside. Mercury was required to strictly adhere to the timing requirements set forth in article 34 of the Code, the UPIP. The deadline for filing a protest under section 34-80(a) was jurisdictional in nature and not subject to forfeiture.

¶ 76                                    III

¶ 77    Mercury's third and final nonconstitutional argument is that, even if its protest was untimely under section 34-80(a), DOAH still had jurisdiction to hear Mercury's protest under DOAH's own enabling ordinance. Mercury first points to our statement in *Stone Street Partners, LLP v. City of Chicago Department of Administrative Hearings*, 2014 IL App (1st) 123654, ¶ 24, that the City of Chicago's department of administrative hearings "found" its jurisdiction "within the provisions of the [Ordinance] by which it is created." (Internal quotation marks omitted.) But that's just reiterating that an agency is a creature of statute that must locate its jurisdiction—that is, its authority—within the confines of the statute that brought it into existence. *Business & Professional People*, 136 Ill. 2d at 243; *Robinson*, 201 Ill. App. 3d at 728.

¶ 78    We determined above that section 34-80(a) of the UPIP limited DOAH's authority to hearing only those protests filed within 20 days of DOR's mailing of its notice of tax determination and assessment to the taxpayer. But Mercury argues that we should also consider another provision in the Code, namely section 2-908(a). See Cook County Code of Ordinances

§ 2-908(a) (amended Oct. 18, 2011). That provision falls under chapter 2, article 9, titled "Administrative Hearings," and provides as follows:

> "Any authorized department, agency, board or commission of the County \*\*\* may institute an administrative adjudication proceeding with the department of administrative hearings by forwarding a copy of a notice of violation or a notice of hearing, which has been properly served, to the department of administrative hearings."
>
> *Id.*

¶ 79    That provision addresses who may institute an administrative proceeding (any county department, agency, board or commission) and how (by forwarding a copy of the notice of hearing or violation to DOAH). Perhaps it could be viewed as *a* precondition to an administrative hearing, but by no means does it claim to be the only one. Nothing in this language abrogates or even qualifies section 34-80(a), which places a strict timeline on a taxpayer's time to file a protest. So even if we were to go so far as to determine that section 2-908(a) were a "jurisdictional" requirement—an issue we need not decide—we would never agree that it's the *only* jurisdictional one. Section 34-80(a)'s 20-day period remains as a jurisdictional deadline that Mercury failed to meet, regardless of section 2-908(a).

¶ 80    And that is to say nothing of section 34-81(a), which only permits DOR to "refer the case to" DOAH "[w]hen a taxpayer or tax collector files a *timely* written protest and petition for hearing." (Emphasis added.) Cook County Code of Ordinances § 34-81(a) (approved Feb. 16, 2011). So DOR is not *allowed* to "institute an administrative adjudication proceeding" under section § 2-908(a) absent a timely filing under sections 34-80(a) and 34-81(a).

¶ 81    If there were any room for doubt, section 2-907 provides that "[t]he provisions of [article 9] shall apply to administrative adjudication proceedings conducted by [DOAH] *to the extent*

22

*that they are not inconsistent with the provisions of the Code which set forth specific procedures for the administrative adjudication of particular code provisions*." (Emphasis added.) Cook County Code of Ordinances § 2-907 (approved Dec. 3, 2008). Any notion that section 2-908(a) provided the exclusive source of "jurisdiction" for DOAH would be plainly "inconsistent" with sections 34-80(a) and 34-81(a), "which set forth specific procedures for the administrative adjudication" of tax protests—including a 20-day jurisdictional deadline for filing a protest. So there can be no plausible argument that section 2-908(a) somehow erases the jurisdictional requirements in section 34-80(a). It may supplement them, but it surely does not supersede them.

¶ 82   Imagine if it were otherwise. A taxpayer could fail to meet a 20-day protest deadline, a flaw we have deemed jurisdictional and thus fatal, but an agency like DOR could simply wash that flaw away and ignore section 34-81(a) by forwarding the requisite papers to DOAH and participating in the hearing, anyway. It would run against everything we know about agency jurisdiction—it would allow an agency to forfeit (or waive) a jurisdictional defect, it would take the limitations of an agency's jurisdiction out of the hands of the authorizing legislative body (and later the courts) and place it solely in the hands of the agency, and it would effectively provide that if there are two jurisdictional hurdles and the taxpayer clears one of them, the other can be ignored.

¶ 83   We cannot agree that any of the provisions cited in article II alter or supersede the jurisdictional requirements in the UPIP for the timely filing of a protest.

¶ 84                                             IV

¶ 85   Having rejected all of Mercury's nonconstitutional arguments, we turn to its due process claim. In simple terms, Mercury claims that the notices and information that DOR provided it

regarding its deadline to file its tax protest were so confusing and misleading that they deprived Mercury of procedural due process under the state and federal constitutions.

¶ 86    Due process is grounded in principles of "fundamental justice and fairness." *People v. Lindsey*, 199 Ill. 2d 460, 472 (2002). Procedural due process guards against unjustified deprivations of life, liberty, or property. *Grimm v. Calica*, 2017 IL 120105, ¶ 21. It bars governmental conduct that infringes on a protected interest if such action "was not preceded by procedural safeguards." (Internal quotation marks omitted.) *Wingert v. Hradisky*, 2019 IL 123201, ¶ 29. And it is "a flexible concept, whose requirements depend on the government action at issue and the private interest implicated by that action." *Grimm*, 2017 IL 120105, ¶ 21.

¶ 87    What process was due Mercury in this case? DOR says that, while it was required to notify Mercury of the tax determination and assessment, it had *no* obligation to tell Mercury of its right to protest that determination, much less the time deadline for doing so. For support, it cites the supreme court's statement in *Grimm* that agencies have no "constitutional duty to inform a party affected by one of its decisions of the statutory right to judicial review or the jurisdictional window in which to exercise that right." *Id.* ¶ 24.

¶ 88    But *Grimm* was talking about the right to *judicial review* of an administrative decision, which itself is not required by due process. See *Carver v. Nall*, 186 Ill. 2d 554, 563 (1999), *overruled in part on other grounds by Nudell v. Forest Preserve District*, 207 Ill. 2d 409 (2003). If judicial review of an administrative action is not required by due process, *notice* of judicial review is obviously not, either. See *id.*; *Grimm*, 2017 IL 120105, ¶ 24 (citing *Nall*). This case does not concern Mercury's right to judicial review; Mercury claims the constitutional violation occurred within the administrative proceeding itself, where the guarantee of due process applies with full force.

¶ 89    Still, while *Grimm* is not applicable for that particular proposition of law to this case, the United States Supreme Court has held that due process does not require the government to explain the available remedies or procedures to internally challenge an administrative action, as long as those remedies are provided in publicly available sources such as statutes, rules, or the like. See *City of West Covina v. Perkins*, 525 U.S. 234, 240-41 (1999); *M.A.K. Investment Group, LLC v. City of Glendale*, 897 F.3d 1303, 1318-19 (10th Cir. 2018) (based on *West Covina*, "As for specific notice of the thirty-day time frame in which to seek review, we agree with Glendale that due process did not require it. If [plaintiff] had been notified of the blight finding, it would have been up to [plaintiff] to find out what remedies were available under state law. *** While letting owners know they only have thirty days to challenge the blight finding may be a best practice, it is not constitutionally compelled.").

¶ 90    Here, section 34-80(a) of the UPIP is an ordinance governing Mercury's right to protest and the filing deadline for the protest, obviously an ordinance available to the public, which we have found unambiguous (at least when it comes to tax notices via U.S. mail, as here). So under *West Covina*, we begin with the understanding that DOR was not required by the constitution to say one word to Mercury about its right to protest the tax determination and assessment, much less the deadline for doing so.

¶ 91    But as Mercury notes, and DOR agrees, "[w]hen an administrative agency chooses" to give notice to a citizen of its rights and remedies, though not constitutionally compelled to do so, "its information must not be misleading." *Grimm*, 2017 IL 120105, ¶ 24. Misleading information from the government about a citizen's rights and remedies to challenge administrative action may violate due process. *Id.*

¶ 92    That's where the issue is joined. Mercury doesn't claim that DOR owed it an affirmative duty to spell out the deadlines for protesting the challenged tax. But it chose to do so, Mercury says, and thus it could not do so in a misleading way. Yet Mercury says that is exactly what happened here—DOR gave Mercury sometimes confusing, sometimes misleading, and sometimes downright inaccurate information about the deadline for filing a protest. That violated due process, and the only remedy for that violation must be to deem the protest "timely" filed.

¶ 93    Mercury relies principally on *Grimm*, where our supreme court found a due process violation when a state agency's notice of a finding of child abuse against the plaintiff misled her into filing a late request for judicial review. The parties sharply disagree on the factual applicability of *Grimm* to this matter, as we will discuss, but there is no question that *Grimm*, if nothing else, provides the framework for our analysis. In determining whether an agency's notice to an individual satisfies due process, we apply the test from *Mathews v. Eldridge*, 424 U.S. 319 (1976). See *Grimm*, 2017 IL 120105, ¶ 24. In *Mathews*, the Supreme Court explained:

> "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

¶ 94    So as in *Grimm*, we will work through each of these three factors.

¶ 95                                        A

¶ 96    Because they are uncontested, we will briefly discuss the first and third *Mathews* factors.

¶ 97    The first factor is the private interest affected by the agency action—whether DOR's actions in this case implicate Mercury's right to life, liberty, or property. See *Grimm*, 2017 IL 120105, ¶ 21. Here, Mercury had a constitutional right to avoid a tax that the government was not authorized to assess. Money is "property" under the due process clause. See *Southern Ry. Co. v. Virginia*, 290 U.S. 190, 194 (1933). A tax is a state-sanctioned taking of that property to which due process protections apply with full force. See *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco, Department of Business Regulation of Florida*, 496 U.S. 18, 36 (1990); *Reich v. Collins*, 513 U.S. 106, 108 (1994).

¶ 98    The third factor is the government's interest, most notably the burden that would be placed on the government to assume heightened procedural protections. Assuming that DOR's communications to Mercury were deficient (the second *Mathews* factor, still to come), the burden on DOR of providing taxpayers like Mercury with accurate information is minimal. As we have noted, due process doesn't require DOR to say anything at all about appeal or protest rights or remedies for aggrieved taxpayers, but if it chooses to do so, it must do so accurately. See *West Covina*, 525 U.S. at 241; *Grimm*, 2017 IL 120105, ¶ 24. Requiring DOR to provide accurate information about protest deadlines and procedures, if it chooses to give any information at all, is not imposing in the least.

¶ 99    Mercury easily satisfies the first and third *Mathews* factors.

¶ 100                                          B

¶ 101   That leaves only the second *Mathews* factor, whether the procedures employed by DOR created a risk that Mercury would suffer an erroneous deprivation of its right not to pay an unauthorized or unlawfully imposed tax. See *Grimm*, 2017 IL 120105, ¶ 24. When evaluating the risk of erroneous deprivation, we examine the current administrative regime or actions that

actually occurred in the case. See *Nelson v. Colorado*, 581 U.S. ___, ___, 137 S. Ct. 1249, 1256 (2017); *Grant v. Trustees of Indiana University*, 870 F.3d 562, 572 (7th Cir. 2017) ("In considering the second factor, the evidence shows Grant was afforded notice and a detailed explanation of the charges and the evidence against him at every step of the two-year process ***.").

¶ 102    Though we previously detailed the communications between DOR and Mercury that preceded the filing of the protest (see *supra* ¶¶ 11-14), they bear repetition here. Mercury points to three communications from DOR that, in Mercury's view, were misleading and inaccurate regarding the deadline for filing Mercury's protest. We must carefully examine each one.

¶ 103                                                           1

¶ 104    The first communication was the "Amusement Tax Delinquency Notice of Jeopardy Tax Determination and Assessment." That letter was dated September 9, 2014 and bore a stamp in the bottom corner noting, in bold and all caps, that it was "MAILED" on September 9, 2014. There is no dispute that this was the accurate date of mailing.

¶ 105    This notice advised Mercury that it had "not remitted the tax due" for the applicable time periods and requested that Mercury remit payment by September 26, 2014. It advised Mercury that if it believed that its tax liability was different than as indicated on the notice, it could complete the form on the reverse side of the notice and send it in with supporting documentation. The notice further informed Mercury that if payment was not received by September 26, 2014, DOR would "schedule an Administrative Hearing and refer the matter to a collection agency." At the end, the notice provided: "If you have any questions regarding this notice, please contact us via phone [number provided] or fax [number provided]. For our ordinances or any other relevant information, please visit us as www.cookcountyil.gov/revenue."

¶ 106    Among other things, Mercury says this notice caused confusion because there is no such thing as a "jeopardy" tax determination and assessment under the UPIP or, at the very least, it's different than a mere "tax determination and assessment," minus the word "jeopardy." And that difference matters, says Mercury, because section 34-80(a)'s 20-day deadline only governs protests of a "tax determination and assessment." Cook County Code of Ordinances § 34-80(a) (approved Feb. 16, 2011). For several reasons, we cannot accept that argument.

¶ 107    For one, it's not at all clear that a "jeopardy" tax determination and assessment under the UPIP is a figment of DOR's imagination. The ALJ had no trouble recognizing it, writing in her decision below that "[a] 'jeopardy tax determination and assessment' is a term of art that refers to an assertion of tax liability based on a source other than a full audit or other than an examination of business records that falls short of a full audit." The ALJ cited section 34-65(3) of the UPIP, which permits DOR to "determine and assess the amount of any tax due and unpaid" if, among other things, "it appears that *** [d]elay will jeopardize the collection of any accrued taxes that are not yet due or payable, and [DOR] declares these taxes to be immediately due and payable." *Id.* § 34-65(3). In its brief, DOR cites that same provision and adds that UPIP's section 34-63(c)(1) requires taxpayers to make their books and records available to DOR, and if it doesn't, subsection (c)(2)(a) permits DOR to "issue a tax determination and assessment based on the best estimate of the person's tax liability." *Id.* § 34-63(c)(1), (c)(2)(a).

¶ 108    On the limited information we have, we are in no position to untangle the technical question of "jeopardy" assessments. But we don't need to. There is no question that a taxpayer reading this notice would understand that it was a tax assessment and demand for payment by a date certain.

¶ 109   And it is equally clear that Mercury understood perfectly well that it was receiving a tax assessment. The record shows that DOR and representatives of Mercury (sometimes its lawyers) engaged in extensive communications before the September 9 notice of tax determination and assessment was mailed to Mercury. On four separate occasions in the previous month—August 2014—DOR told Mercury's agents and lawyers that DOR required Mercury "to register as tax collectors under the Cook County Amusement Tax Ordinance and that if these entities failed to so register, [DOR] would serve them with a tax assessment for the months of May and June, 2014."

¶ 110   And only days after receiving the notice, the DOR auditor e-mailed Mercury's lawyer a blank "Protest and Petition for Hearing" form (perhaps at counsel's request; the record is unclear). It's hard to imagine why a form to *protest* a tax determination and assessment would be necessary unless the taxpayer had *received* a tax determination and assessment from DOR.

¶ 111   There is no denying, in other words, that Mercury had actual notice that it was receiving a tax determination and assessment, at least by September 17, if not immediately upon receipt. And actual notice is enough to satisfy due process, even if the agency didn't render notice properly. See *Stratton v. Wenona Community Unit District No. 1*, 133 Ill. 2d 413, 432-33 (1990); *People ex rel. Kelly v. Sixteen Thousand Five Hundred Dollars ($16,500) United States Currency*, 2014 IL App (5th) 130075, ¶ 28; *Campbell v. Cook County Sheriff's Merit Board*, 215 Ill. App. 3d 868, 870-71 (1991).

¶ 112   But while the September 9 notice may have served to notify Mercury of DOR's tax assessment and determination, it did nothing to inform Mercury of its right to protest that action. As explained, DOR had no constitutional duty to do so. *West Covina*, 525 U.S. at 240-42; *M.A.K. Investment Group*, 897 F.3d at 1318-19. Beyond mere silence, however, three

aspects of that notice could have been confusing or misleading to Mercury regarding its right to protest and the deadline for exercising that right.

¶ 113   For one, the notice did mention something akin to a "protest" when it provided that, if Mercury disagreed with the amount of the tax assessment, it could fill out the form on the reverse side and submit it with supporting documentation. A reasonable person could think that challenging the amount of the tax assessment would count as *some* form of "protest." Yet no deadline was provided for the sending of that backside form and its supporting documentation.

¶ 114   Second, the notice provided that if payment were not received by the due date (September 26), DOR would "schedule an administrative hearing." Having reviewed the Code, we presume this meant that DOR would file a "notice of violation" with DOAH for Mercury's failure to remit the tax, as opposed to forwarding a "notice of protest" to DOAH. See Cook County Code of Ordinances § 2-908(a) (amended Oct. 18, 2011). But we don't know that to be true. That question hasn't been briefed, and we are anything but experts on the UPIP or the Code in general.

¶ 115   The point is, it's unclear at best. What is a taxpayer supposed to think this "administrative hearing" represented? A *protest* hearing? That wouldn't be an unreasonable conclusion. A reasonable person could understand that language to mean that, if Mercury didn't remit the tax by the due date, a *protest* hearing would be automatically scheduled. The thinking would be, the refusal to pay the tax by the due date is, itself, a "protest" triggering a hearing. That is certainly a permissible read of this notice, if not the correct one.

¶ 116   And third, along the same lines as the second point, even if Mercury were well-versed in section 34-80(a) of the UPIP and felt confident that its protest was due 20 days after the notice was mailed on September 9—meaning the protest was due September 29—the *payment* due date

was September 26. The payment was due before the protest was due? An "administrative hearing" would be scheduled if Mercury didn't pay by September 26, but Mercury had until September 29 to seek an "administrative hearing" by way of protest? Does that mean two different "administrative hearings" would be scheduled? It's fair to say that a reasonable person would be confused by all of this.

¶ 117   As noted above, on September 17—six days after receiving the notice—Mercury received the protest form from the DOR auditor. Had that protest form cleared matters up and clearly delineated the deadline for a protest, we would say that Mercury had actual notice of the protest due date well before the deadline, and that actual notice would have cured any deficiency in the notice. But as we will see, the protest form did nothing to clear up any confusion over the due date of the protest; it only muddied the waters further.

¶ 118                                                     2

¶ 119   The "Protest and Petition for Hearing" form, which DOR e-mailed to Mercury's lawyer on September 17, was a standard blank form for a taxpayer to protest a tax and seek an administrative hearing. The taxpayer had to fill out its name and address, indicate that it was protesting a specific tax assessment, and then fill out the following:

> "The Petitioner's notice of the County's tax determination and assessment in the amount of $_____ was delivered/mailed on _____, and as such Petitioner hereby files this petition within twenty days thereof pursuant to SECTION 34A of the Uniform Penalties, Interest, and Procedures Ordinance of Cook County." Cook Cty. Dep't of Revenue, Protest and Petition for Hearing, https://www.cookcountyil.gov/sites/default/files/protest_and_petition_for_hearing_form.pdf (last visited May 3, 2019) [https://perma.cc/X45U-9BXL].

¶ 120   It is this quoted passage that draws complaints from Mercury. First, the reference to DOR's tax determination and assessment being "delivered/mailed" on a certain date. Second, the reference to "Section 34A" of the UPIP, for there *isn't* a section 34A, only section 34.

¶ 121   We already discussed this protest form at some length in Part I-B above. There is little doubt what this standardized form was trying to accomplish with its use of the language "delivered/mailed"—DOR was trying to cover both possible trigger dates: the date a notice is "delivered," if sent by personal delivery, and the date the notice is "mailed," if sent by U.S. mail.

¶ 122   But that doesn't mean that this message was adequately conveyed to the taxpayer. It was not. The phrase "delivered/mailed" could be reasonably read to mean that *either* of those dates would suffice as the triggering date. After all, for someone who is sent a tax notice via U.S. mail, there is *both* a date of mailing *and* a date of delivery. The notice to Mercury, for example, was "mailed" on September 9, 2014, and the date that Mercury received it—that is, the date it was "delivered" to Mercury—was September 11.

¶ 123   It would be perfectly reasonable for a taxpayer to consider the date it received a notice in the U.S. mail as the date the notice was "delivered." The verb "deliver" means to "[b]ring and hand over (a letter, parcel, or goods) to the proper recipient or address," as in " 'the products should be delivered on time.' "[3]

¶ 124   So a taxpayer receiving DOR's notice of tax determination and assessment by U.S. mail could reasonably believe that the phrase "delivered/mailed" on this protest form was *not* referring to two different triggers for two different modes of service, but rather to two different triggers for one particular mode of service—service by U.S. mail. Would it seem odd that a taxpayer got to pick from two different dates? Maybe so. But that doesn't make that

---

[3] Oxford English Dictionary, https://en.oxforddictionaries.com/definition/deliver (site last visited April 18, 2019).

interpretation unreasonable or, at the very least, it shows that the information DOR provided was confusing.

¶ 125   And obviously, the protest form did not help matters by citing "Section 34A" of the UPIP as the relevant set of ordinances, considering that section 34 is the governing portion of the UPIP, and section 34A doesn't exist.

¶ 126   In DOR's defense, this protest form was not purporting to give Mercury (or any other taxpayer) advice or direction on when to file the protest form. It was not a "How-To" or "FAQ" sheet. It was the protest form, itself. Standardized forms are just that—generic, not specifically tailored to a particular taxpayer; that's why items are left blank, to let the taxpayer fill in the specifics. So the reference to "delivered/mailed" meant to cover both service by personal delivery and service by U.S. mail, and the taxpayer was supposed to pick between those two.

¶ 127   While we accept the caveat that this protest form was never intended to be an official "notice" or official advice on time deadlines, the fact remains that this protest form was available online to the public. It would not be so unreasonable to expect that taxpayers might look to that protest form as an indication of their rights and remedies. More to the point, any taxpayer even considering a protest would, at some point, come into contact with that protest form and digest its contents; DOR requires its use for protests. Even if a taxpayer (who received its tax notice by U.S. mail) believed that it understood that the trigger date for the 20-day clock was the date of "mailing," reading this protest form might give that taxpayer considerable pause.

¶ 128                                                      3

¶ 129   We now reach the final communication Mercury cites. As we noted in the background section, on September 23, 2014, Mercury's attorney sent the DOR auditor handling its matter an

e-mail stating, "Please confirm the due date for the protests, based on our receipt on September 11, the due date would be October 1, 2014. Please confirm[.]"

¶ 130   The DOR auditor's response:

> "That is correct.
>
> The taxpayer receiving an assessment has 20 days from the date of receipt to file a protest and petition for hearing. Your receipt date was September 11, 2014. *Thus, the due date to file the protest is October 1, 2014.*" (Emphasis in original.)

¶ 131   As we have made clear by now, under section 34-80(a) of the UPIP, the DOR auditor's e-mailed response was incorrect. The 20-day clock to protest a tax notice sent by U.S. mail is not the "date of receipt," as the DOR auditor e-mailed, but the date of "mailing" the notice. Cook County Code of Ordinances § 34-80(a) (approved Feb. 16, 2011). The DOR auditor should have answered that the clock began 20 days after the date of mailing, and thus the due date was September 29, 2014.

¶ 132   Instead, the auditor said the date of "receipt" was the operative date. As we just explained above, the protest form could have reasonably led Mercury to believe the same thing: that the date the tax notice was "delivered" by U.S. mail to the taxpayer, or said differently, the date of Mercury's "receipt" of that tax notice, was the date triggering the 20-day clock on its protest rights.

¶ 133   Simply put, Mercury could have reasonably interpreted the protest form as indicating that the date of "deliver[y]" or "receipt" of the tax notice was the relevant trigger date. And the DOR auditor did nothing to dispel that notion. Instead, she confirmed it.

¶ 134   True, an auditor is not a lawyer, and asking an auditor what is essentially a legal question (the limitations period for filing a protest) might seem unreasonable at first blush. But this

auditor was not some random DOR employee. This auditor had conducted the initial tax investigation, communicating regularly with Mercury and its lawyers in the process. She was the one who sent Mercury the protest form. And most critically, this auditor carefully oversaw and chronicled the initial administrative procedures. Her audit report notes the following:

"*9/9/14*: Amusement Tax Delinquency Notice of Jeopardy Tax Determination and Assessment has been mailed for both businesses owned by [Mercury's owner]. Note: three copies were mailed (Business address, owner's home addresses and the attorney's address).

*9/12/2014*: Received the postal office confirmation that [Mercury's counsel] has received both Assessment Notices.

*9/12/2014*: Received the postal office confirmation that the mail has been delivered to the following address: Mercury Sightseeing Boats, Attn: [Mercury's owner].

*9/17/2014*: I e-mailed the Petition for Protest and Hearing form to [Mercury's counsel].

*9/18/2014*: I e-mailed [Mercury's counsel] asking to confirm that she has received the Petition for Protest and Hearing form.

*9/24/2014*: I have received an e-mail from [Mercury's counsel] to confirm the due date for protest and petition form."

¶ 135   So we are not presented here with a situation where Mercury's lawyer stopped a janitor in the bathroom for this information, or even called a general number and asked the question of the first person who answered. This auditor, from Mercury's perspective, was the face of DOR and someone clearly familiar with the administrative procedures surrounding a tax protest.

¶ 136   Simply put, the protest form could have caused uncertainty in the mind of a reasonable person (even a reasonable attorney) as to the operative trigger date. It was reasonable for Mercury to inquire further. And given the DOR auditor's role in this affair, it was just as reasonable that Mercury would have directed that inquiry to her.

¶ 137   To recap, the initial September 9 notice was confusing and internally contradictory in several ways regarding Mercury's deadline to file a protest. DOR's official protest form, which Mercury was required to use, made matters worse. It suggested, for those like Mercury receiving their tax notices by U.S. mail, that the date the tax notice was "delivered" could be the operative date. And finally, the principal representative of DOR with whom Mercury had been corresponding, including on matters of procedure, confirmed that misimpression by telling Mercury that the date of "receipt" was the operative trigger date.

¶ 138   For all these reasons, we deem the risk of an erroneous constitutional deprivation in this case to be high.

¶ 139                                    C

¶ 140   Now that we have considered the *Mathews* factors, we compare this case to the decision in *Grimm*, 2017 IL 120105, on which Mercury principally relies for its due process claim. There, the Department of Children and Family Services (DCFS) denied a request by Grimm, a school teacher, to expunge a finding of child abuse. *Id.* ¶¶ 4-5. It so notified Grimm of its final decision by sending a letter to her lawyer that concluded with this:

> " 'This represents the final administrative decision of [DCFS]. If you disagree with any part of it, you may seek judicial review under the provisions of the Administrative Review Law, 735 ILCS 5/3-101 *et seq.* (West 2010), within 35 days of the date this decision was *served* on you.' " (Emphasis added.) *Id.* ¶ 5.

¶ 141   Grimm filed a complaint for administrative review 35 days after her lawyer's receipt of the notice. *Id.* ¶ 6. That was a day late, argued DCFS, because section 3-103 of the Administrative Review Law provides that a notice is "served" on the date it is "mailed." *Id.* ¶ 7; see 735 ILCS 5/3-103 (West 2012) ("a decision shall be deemed to have been served either when a copy of the decision is personally delivered or when a copy of the decision is deposited in the United States mail"). As the letter was mailed (by certified mail) 36 days before Grimm filed her complaint for administrative review, she blew a jurisdictional deadline that was fatal to her claim. *Grimm*, 2017 IL 120105, ¶ 7.

¶ 142   Our supreme court agreed that Grimm had missed the jurisdictional deadline, that the date of mailing was the operative date. *Id.* ¶ 18. But the court held that the notice to Grimm violated Grimm's right to procedural due process. *Id.* ¶¶ 18, 28. The court recognized that DCFS was under no constitutional obligation to tell Grimm anything whatsoever about her right to seek judicial review of the adverse final administrative decision, but when it "chooses to do so, *** its information must not be misleading." *Id.* ¶ 24. And the notice, the court determined, was misleading.

¶ 143   First and foremost, the notice told Grimm that she could seek judicial review from the date that the notice was "served" but did not explain that a notice is considered "served," when sent by U.S. mail, on the date it is "mailed." *Id.* ¶ 26. And it would not have been obvious for Grimm to understand that the mailing date was the operative trigger date—indeed, it would be "counterintuitive" and "probably confusing." *Id.*

¶ 144   And second, while the notice did cite generally to the Administrative Review Law, where the answer to this question could have been found, it did not cite specifically to the statutory

provision that would have explained that the date of mailing was the operative date, section 3-103. *Id.*; see 735 ILCS 5/3-103 (West 2012).

¶ 145   When balancing the great risk of an erroneous constitutional deprivation and the obvious interest Grimm had in clearing her name and returning to teaching against the minimal burden that would be placed on DCFS to simply clarify its notice, the court held that Grimm had been denied due process. *Grimm*, 2017 IL 120105, ¶ 28. As a remedy, the court considered Grimm's complaint for administrative review to have been timely filed. See *id.*

¶ 146   The DCFS notice to Grimm was technically accurate; its flaw was simply that the notice didn't explain something that might not be obvious to a layperson—that the date of "service" is the date that the notice was "mailed." It was misleading, in other words, but no more than that. By comparison, what happened here was far worse. DOR's initial notice was confusing and internally contradictory, followed by a DOR-generated protest form that was more misleading still,  and ending with an affirmative statement by Mercury's DOR auditor that confirmed that misleading impression and was flat-out wrong.

¶ 147   To be sure, one could step back from all of this and ask why Mercury couldn't have just relied on the plain language of section 34-80(a), which we have found above to be unambiguous. It's a fair point. But the same could have been said of Grimm, whose lawyer easily could have perused the Administrative Review Law and uncovered section 3-103, which spelled out that the date of mailing was considered the date of service. But the supreme court specifically noted that DCFS's notice did not refer Grimm (or her lawyer) to section 3-103 specifically, only citing generally the Administrative Review Law. *Id.* ¶ 26. We take from *Grimm* that, if the notice is confusing or misleading as to the deadline for the citizen to challenge the agency action, it might

39

be curable if the notice specifically directs the citizen to the relevant statute, but it is *not* enough to merely cite the entire statutory scheme generally. See *id.*

¶ 148   And here, of course, DOR did less than DCFS did in *Grimm*. DCFS cited a specific statutory scheme contained, all by itself, within article III of the Code of Civil Procedure that consists of thirteen sections. *Id.*; see 735 ILCS 5/3-101 *et seq.* (West 2012). It's not exactly beach reading, but it's relatively short, and at least the answer is found within those thirteen sections.

¶ 149   Here, in contrast, the initial notice said that if Mercury had any questions, it could call a phone number, send an inquiry by fax, and "[f]or our ordinances or any other relevant information, please visit us as www.cookcountyil.gov/revenue." That link does not take the taxpayer directly to the Code; it's the general webpage for DOR. No doubt, one could find the ordinances somewhere on that web page back in 2014. But *Grimm* says that's not enough; indeed, it's far less than what DCFS provided to Grimm.

¶ 150   The standard DOR protest form e-mailed to Mercury came closer, by referencing "SECTION 34A of the Uniform Penalties, Interest and Procedures Ordinance of Cook County." (Emphasis in original.) Of course, as noted, there is no section 34A, only section 34. But even if the taxpayer overcame that hurdle, section 34 itself does not consist solely of the UPIP. It's the general "Finance" section of the Code and contains six different articles within it. See generally Cook County Code of Ordinances §§ 34-1 to 34-377. Article III is the UPIP, and that article alone consists of 37 substantive sections. Cook County Code of Ordinances §§ 34-60 to 34-97.

¶ 151   Mercury, in other words, was required to figure out the correct section—34, not 34A— then head to the correct article within that section (which DOR did not provide) and read an ordinance that spanned 37 sections. If citing the comparatively shorter and self-contained

Administrative Review Law was not enough direction in *Grimm* to satisfy due process, then the information contained in DOR's protest form comes nowhere close to constitutional compliance.

¶ 152   And though DOR hammers on the point that Mercury had retained able counsel to represent it at all relevant times, we agree with Mercury that due process protects "*any* party, whether unlettered or well versed." (Emphasis in original.) *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 800 (1983); *Teerling Landscaping, Inc. v. Chicago Title & Trust Co.*, 271 Ill. App. 3d 858, 867 (1995) (quoting *Adams*, 462 U.S. at 800); *Gibbs v. Estate of Dolan*, 146 Ill. App. 3d 203, 207-08 (1986) (quoting *Adams*, 462 U.S. at 800). Though an agency may be required to go the extra mile when it's aware of a party's inexperience, "it does not follow" that the agency may forgo proper notice "to parties who are particularly resourceful" or "sophisticated." *Adams*, 462 U.S. at 799-800. Indeed, as noted, Grimm was represented by counsel (though not for long, as she terminated the relationship and sought new counsel), but the presence or absence of counsel did not factor into the majority's analysis in *Grimm* whatsoever.

¶ 153   In sum, the combination of communications from DOR to Mercury promoted far more confusion—including ultimately flat-out wrong information—than the notice in *Grimm*. And the citations to the relevant ordinances were far less helpful than DCFS's general citation to the Administrative Review Law in *Grimm*. For these reasons, the risk of an erroneous constitutional deprivation was more severe here than in *Grimm*.

¶ 154 When we balance the competing *Mathews* factors, the decision is clear. Mercury's interest in avoiding a tax it claims to be illegal and unauthorized, plus the significant risk of erroneous deprivation caused by DOR's confusing and inaccurate information regarding the protest filing deadline, far outweigh the burden on DOR to correctly communicate the time deadline for tax protests. We thus hold that Mercury was deprived procedural due process.

¶ 155                                    D

¶ 156    The remedy for this due process violation, as in *Grimm*, 2017 IL 120105, ¶ 28, is to deem Mercury's protest timely filed or, said differently, to hold that Mercury's failure to file the protest by September 29, 2014, did not deprive DOAH of jurisdiction to hear that protest.

¶ 157    The trial court never reached the merits of the administrative decision. On remand, now that we have held that DOAH had jurisdiction to hear Mercury's protest, the trial court should consider the merits of DOAH's final decision.

¶ 158                              CONCLUSION

¶ 159    The judgment of the circuit court is vacated. This cause is remanded to the circuit court for a consideration of the final administrative decision on the merits.

¶ 160    Vacated and remanded.