# Illinois Official Reports

## Appellate Court

---

### *Keystone Montessori School v. Village of River Forest,*
### 2021 IL App (1st) 191992

---

| | |
|---|---|
| Appellate Court Caption | KEYSTONE MONTESSORI SCHOOL, Plaintiff-Appellee and Cross-Appellant, v. THE VILLAGE OF RIVER FOREST, Defendant-Appellant and Cross-Appellee. |
| District & No. | First District, Sixth Division<br>No. 1-19-1992 |
| Filed<br>Rehearing denied | June 25, 2021<br>July 20, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-CH-2949; the Hon. Sanjay T. Tailor, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Allen Wall, Gregory T. Smith, and Caitlyn R. Culbertson, of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellant.<br><br>John W. Mauck, of Mauck & Baker, LLC, of Chicago, for appellee.<br><br>Christine L. Self, of the Illinois Municipal League, of Springfield, *amicus curiae.* |

JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment and opinion.


**OPINION**

¶ 1        Plaintiff Keystone Montessori School (Keystone) brought suit against defendant the Village of River Forest (Village) concerning agreements between Keystone and the Village and a development permit issued by the Village that, in relevant part, required otherwise tax-exempt Keystone to waive its right to a property tax exemption. The Village brought counterclaims to enforce the agreements and permit. The circuit court issued orders granting Keystone summary judgment on its claim that the agreements were against public policy, granting summary judgment for Keystone on the Village's counterclaims, and granting the Village's motion to dismiss Keystone's unjust enrichment claim. On appeal, the Village contends that the court erred in (1) determining that there were no genuine issues of material fact regarding Keystone's property tax status, (2) failing to determine that Keystone's complaint was barred by limitations and the doctrine of *laches*, (3) determining that the agreements were void for being against public policy, and (4) denying the Village's counterclaims. On cross-appeal, Keystone contends that (1) the trial court erred in denying its unjust enrichment claim and (2) this court should sanction the Village for making frivolous or bad-faith arguments in its appellate brief. For the reasons stated below, we affirm the judgment of the circuit court and deny sanctions.

¶ 2                                    I. JURISDICTION
¶ 3        Upon Keystone's 2018 complaint (six counts as amended) and the Village's counterclaims as amended, two of Keystone's claims were dismissed in the federal district court in July 2018 while the case was removed there. Following remand to the Illinois courts, the circuit court granted summary judgment for Keystone on one of its claims in April 2019. The court granted summary judgment for Keystone and denied summary judgment for the Village on all of the Village's counterclaims in May 2019. The court granted the Village's motion to dismiss Keystone's sixth claim and dismissed Keystone's two remaining undisposed claims as moot on September 13, 2019. The Village filed its notice of appeal on October 2, 2019, and Keystone filed its notice of cross-appeal on October 11, 2019. Accordingly, this court has jurisdiction in this matter pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017) governing appeals in civil cases.

¶ 4                                    II. BACKGROUND
¶ 5        In 1998, Keystone applied to the Village to operate a school on a parcel of land in the Village that was leased and then owned by Keystone. The parcel was zoned by the Village zoning ordinance for commercial uses, and a school was not a permitted or special use thereof. The Village and Keystone signed agreements as conditions of the Village possibly issuing a planned development permit (Permit) to Keystone to operate a school on the parcel. The Permit was issued in November 1998 by Village ordinance, and the agreements and Permit imposed

various conditions on Keystone, one of which was that it would not apply for an exemption on its property taxes for the parcel. Keystone did not apply for a property tax exemption until April 2018, and it was granted in November 2018.

¶ 6                                A. Complaint

¶ 7        Keystone filed its complaint for declaratory judgment and damages in March 2018, alleging that it is a nonprofit corporation recognized as tax-exempt by the Internal Revenue Service in 1995. It operated in the Village in rented space from 1994 until 1997 when it agreed with a local school district to purchase a former public school. However, the Village board "favored a different plan" to have residences on that land "in order to convert a tax-exempt site into a tax-producing site." Thus, the Village allegedly pressured the school district "to renege on its agreement with Keystone." In July 1998, the Village president urged Keystone to consider the parcel instead, where the Village "had rejected other development projects" so that the parcel had been "vacant for nearly five years." Keystone took possession of the parcel in August 1998, having entered into a lease with an option to buy at the end of the lease in December 1998. Keystone remodeled the parcel and operated a school there from September 1998 onward.

¶ 8        Because a school was not a permitted use of the parcel under the Village zoning ordinance, Keystone and Village agreed that Keystone would apply for a planned development permit and the Village would waive strict compliance with the ordinance in the interim (the Forbearance Agreement). The Village communicated to Keystone for the first time in October 1998 that its use of the parcel would be permitted only if it agreed never to seek a property tax exemption, and Village officials said that the parcel's zoning would not be changed to allow a school unless the parcel continued to generate property tax revenue. As Keystone had remodeled and was running a school on the parcel that it did not want to close, "Keystone yielded to the demands" of the Village. In 1998, the Village's development review board approved Keystone's application with various conditions "and the major demand that" Keystone pay property taxes.

¶ 9        The "Village's demands are detailed in the 'Agreement Regarding Property Taxes' executed on November 23, 1998" (Tax Agreement), providing in relevant part that, as long as Keystone owns or occupies the parcel, it "shall be and remain fully subject to real estate taxes and Keystone shall not seek or accept any exemption from such taxes" and that, if the parcel became tax-exempt, the Permit may be declared void and Keystone would pay the Village $100,000 annually. Once the Tax Agreement was executed, the Village board adopted an ordinance granting the Permit.

¶ 10       Keystone purchased the parcel in December 1998 with tax-exempt bond financing, which it was still paying at the time of its complaint. Beginning in 2002, Keystone sought to amend the Tax Agreement, noting that it significantly redeveloped the previously vacant parcel and arguing that Keystone saved more money for taxpayers by educating Village children not at school board expense than it paid the Village in property taxes. "Accordingly, Keystone made formal requests to the Village in 2003, 2004, 2007, 2009, and 2011 to reduce its tax burden." Keystone had also argued changed circumstances since the Tax Agreement: its property taxes had been reassessed and increased substantially, and it faced "fluctuating tuition, decreased fundraising in a tough economic market, and greater restriction on lending by banks." Keystone

- 3 -

suggested that it be allowed to apply for an exemption in exchange for "negotiated payments in lieu of the taxes," but the Village repeatedly rejected proposals to amend the Tax Agreement.

¶ 11 At the time of the complaint, property taxes on the parcel were "the largest single item" in Keystone's budget, with an annual tax bill of about $96,000 and a total of $1.1 million paid, and it was paying each month $7958 in bond payments and $1244 on a loan to pay property taxes and remodeling costs. "The majority of the funds to pay the property taxes come from donations." Because of these expenses, Keystone had a reduced budget for learning materials, classroom supplies, field trips, teacher pay, and building maintenance. Three other private nonprofit schools operate in the Village, all with property tax exemptions.

¶ 12 Count I of the complaint alleged that the Tax Agreement prohibiting Keystone from applying for a property tax exemption was contrary to public policy, as expressed in the Property Tax Code (Tax Code) provision for tax exemption for school property. 35 ILCS 200/15-35 (West 2018). Count II alleged that Keystone had a constitutional right to seek a tax exemption and the Village was imposing an unconstitutional condition on that right. Count III alleged that the Village conditioning its zoning approval on Keystone waiving its right to an exemption was illegal contract zoning under Illinois law. Count IV alleged that the Tax Agreement was unenforceable as a perpetual contract, which Illinois law looks upon with disfavor. Count V (mistakenly labeled count IV) alleged a violation of Keystone's right to equal protection of the law by creating a "class of one" or intentionally treating Keystone differently that others similarly situated because Keystone is the only nonprofit the Village required to waive its right to a property tax exemption and the Village had no rational basis for so requiring. Keystone sought a declaratory judgment that the Tax Agreement was void as contrary to public policy, illegal contract zoning, void as an unconstitutional condition, voidable as a perpetual contract, and a violation of Keystone's right to equal protection. Keystone sought attorney fees under the Illinois Civil Rights Act of 2003 (Civil Rights Act) (740 ILCS 23/5(c) (West 2018)) and damages of $1.1 million for property taxes paid.

¶ 13 Attached to the complaint were copies of the Forbearance Agreement, Tax Agreement, and the Village ordinance issuing the Permit. The Forbearance Agreement recited that Keystone wanted to operate a school on the parcel, recognizing it would violate the Village's zoning ordinance, and thus wanted the Village to refrain from strictly enforcing its ordinance for a short time for Keystone to come into compliance. Keystone agreed not to occupy the parcel after December 1, 1998, without a permit, to maintain the parcel in good repair, to operate the school in compliance with all Village ordinances but the zoning ordinance, and to apply for a permit within 30 days with the understanding that the Village could deny it. The Forbearance Agreement also provided that Keystone would indemnify, defend, and hold harmless the Village in any action or judgment naming the Village arising from or relating to Keystone's use of the parcel.

¶ 14 The Village ordinance of November 23, 1998, granted the Permit, approving use of the parcel as requested by Keystone subject to conditions including a sprinkler system and a privacy fence and that Keystone "enters into the attached" Tax Agreement "and continues to abide by" it.

¶ 15 The Tax Agreement of November 23, 1998, recited that the Village had been seeking a commercial owner or tenant for the parcel, "derived significant revenues from both sales and property taxes" from the parcel in the past, and wanted the parcel to "remain on the tax rolls." The agreement also recited that the parcel was zoned commercial, that a school was a

prohibited use thereon, and that Keystone president Victoria Shea represented on October 15, 1998, to the Village's development review board and November 9, 1998, to the Village board that Keystone intended to pay property taxes and would not seek or accept a property tax exemption. Keystone agreed to not seek or accept a property tax exemption as long as it owned, occupied, or used the parcel. The Tax Agreement would become part of Keystone's Permit application and was "a material and significant factor" in the Village board's consideration of the application, which the board had discretion to grant, deny, modify, or subject to conditions. Keystone would be free to seek a reduction in valuation, with notice to the Village. If the parcel became tax-exempt, the Village could void the Permit and enforce its zoning ordinance accordingly, and Keystone would owe the Village $100,000 for each year the parcel was exempt. If Keystone did not pay the latter, the Village would receive liquidated damages of $500,000. Keystone would confess any judgment the Village sought and not contest it at trial or by appeal. Keystone "stipulates that it has not been coerced to execute this agreement either by the Village or any circumstance" and that its counsel and board reviewed and approved the Tax Agreement. The Tax Agreement would terminate if Keystone ceased using the parcel as a school and either conveyed title to the parcel to a person or entity other than a subsidiary or successor of itself, or permanently vacated the parcel.

¶ 16                                    B. Removal and Remand

¶ 17        The Village removed the case to federal court in March 2018 on the basis that counts II and V of the complaint raised federal claims. The Village filed a motion to dismiss, arguing in relevant part that counts II and V failed to state federal claims upon which relief could be granted.

¶ 18        In July 2018, the federal court granted the motion regarding counts II and V. *Keystone Montessori School v. Village of River Forest*, 316 F. Supp. 3d 1061 (N.D. Ill. 2018). While count II alleged an unconstitutional condition, the right that the Village allegedly coerced Keystone to waive was not a constitutional right but one arising under Illinois law, specifically the Tax Code. *Id.* at 1064-65. Count V raised a class-of-one equal protection claim, alleging that the Village singled out Keystone as the only nonprofit required to forfeit its property tax exemption as a condition of operation. However, as the complaint acknowledged, absent the Permit,

> "the Village's zoning ordinance prohibits the operation of a school on the property Keystone currently owns and occupies. In other words, by granting the permit, the Village actually singled out Keystone for *favorable* treatment, authorizing it to operate at a location where it was otherwise prohibited by the Village's generally-applicable zoning ordinance." (Emphasis in original.) *Id.* at 1066.

Also, nothing in the complaint indicated that there was another nonprofit operating in the Village in a location where its activities would otherwise be prohibited by Village zoning ordinance, so that the complaint failed to "raise a plausible inference that the Village has treated a similarly situated entity differently from how it has treated Keystone." The two federal claims being dismissed, the federal court remanded the case to the Illinois courts. *Id.*

¶ 19                            C. Proceedings Following Remand

¶ 20        In July 2018 following remand to the circuit court, Keystone filed a motion for a preliminary injunction against the Village enforcing the Tax Agreement, Forbearance

- 5 -

Agreement, and Village zoning ordinance against Keystone. Keystone argued that the Tax Agreement violated public policy, constituted illegal contract zoning, and was an invalid perpetual contract. Keystone alleged that, since filing its complaint, the Village was opposing Keystone's application for a property tax exemption, the mortgage holder for the parcel was foreclosing, and the parcel's unpaid taxes had been purchased by a tax buyer. The "Village's opposition has created significant uncertainty" for parents, students, and faculty of Keystone's school, and Keystone would suffer irreparable harm by "the loss of students and faculty, damage to reputation, possible foreclosure of its property, a tax sale of its property, and the frustration of its mission to educate."

¶ 21    Attached to the motion in addition to the Tax Agreement and Forbearance Agreement was the July 2018 signed statement of Keystone president Shea. Keystone leased the parcel with the right to purchase, renovated the parcel, and opened a school in September 1998 and agreed with the Village that Keystone would apply for the Permit. In early October 1998, the Village told Keystone that the school would be permitted on the parcel only if Keystone "agreed to never seek a property tax exemption," and Village officials told Keystone that the parcel's zoning would be changed to allow the school only if the parcel was generating property tax revenue and that the Village would not permit Keystone to occupy the parcel until Keystone "agreed to the demands." The Village's development review board ruled on October 15, 1998, that use of the parcel as a school complied with the relevant zoning criteria subjection to conditions "and the major demand that [Keystone] pay property taxes despite its compatibility with zoning." The school had paid about $1.1 million in property taxes over 20 years, owed $143,313.45 in property taxes for tax years 2016 and 2017, and the parcel's delinquent taxes were sold on May 7, 2018, according to county records. Keystone had 18 employees including 8 teachers and had educated 3268 students in 20 years including 697 from the Village. Because of the Tax Agreement, Keystone had a reduced budget for learning materials, classroom supplies, field trips, teacher pay, and building maintenance.

¶ 22    The Village appeared and filed a motion to dismiss the complaint. The Village argued that the 2018 complaint was raising claims arising out of the Tax Agreement entered into in November 1998 but subject to either a 5-year or 10-year limitation period (735 ILCS 5/13-205, 13-206 (West 2018)). Similarly, the Village argued that Keystone failed to seek relief from the Permit and Tax Agreement in the years between 1998 and 2018. Noting that counts II and V had been dismissed in federal court, the Village argued that the remaining counts did not state claims upon which relief could be granted because (1) a landowner may not agree to conditions to obtain a zoning variance, receive the benefits of the variance, and then dispute the conditions; (2) for count I regarding public policy, the Tax Code provision for tax exemptions does not create a public policy that a tax-exempt entity cannot waive or contract away its right to an exemption; (3) said counts challenged the Tax Agreement, in which Keystone knowingly waived the rights it was now seeking to enforce; and (4) Keystone failed to allege facts showing that the Tax Agreement was arbitrary and capricious as would be required for its contract zoning claim in count III. Lastly, the Village argued that Keystone should be denied attorney fees under the Civil Rights Act because the remaining contract-related counts did not raise constitutional claims.

¶ 23    The Village also responded to Keystone's motion for a preliminary injunction, arguing that an injunction against the Village enforcing the Tax Agreement would be futile because the Village has a right independent of the Tax Agreement to appear before the property tax

authorities and contest Keystone's application for an exemption. Also, Keystone can apply for an exemption without obtaining relief from the Tax Agreement if it ceases using the parcel as a school. Keystone would not suffer irreparable harm, as its exemption application had not been approved, its foreclosure arose in a context where it was not paying its property taxes and still did not have enough money to pay its other obligations, and uncertainty among school parents and staff arose from that inability to pay obligations rather than from the Village's opposition to the exemption application. "A solution to Keystone's financial problems does not lie with this Court. This Court cannot give Keystone a property tax exemption nor can it provide any relief from the foreclosure action." The Village argued that Keystone cannot be irreparably harmed if "it has been sitting on its alleged rights for twenty (20) years." The Village also argued that Keystone could not demonstrate a likelihood of success on the merits for the reasons stated in the Village's motion to dismiss. Lastly, the balance of the harms was against an injunction because Keystone was seeking to keep the benefits of its Permit without its obligations under the Tax Agreement, and the public interest in the Village being able to adopt and enforce a zoning ordinance and development policy was against an injunction.

¶ 24    Keystone responded to the motion to dismiss. It argued that limitations or *laches* cannot be used to dismiss claims that a contract is void *ab initio* or illegal and that the Village was engaging in a continuing violation of Keystone's rights so that limitations did not apply. Keystone argued that it stated claims upon which relief can be granted. The doctrine that one cannot challenge conditions on a variance from which one has received benefits does not encompass conditions that are illegal or violate public policy. The Tax Code does not expressly provide nor preclude a claim that the Tax Agreement violates public policy, and courts in other states have held that a school's right to a tax exemption benefits the public and supersedes a municipality's zoning authority or contractual rights. Contract zoning is illegal when a local government extracts an agreement or condition from a landowner unrelated to the merits of the landowner's zoning application, and the condition at issue here was unrelated because the parcel could be used for tax-exempt purposes other than a school without waiving the property tax exemption. Keystone could seek attorney fees under the Civil Rights Act because it did not have only contract claims; that is, the federal district court had not disposed of Keystone's count II unconstitutional condition claim or count V equal protection claim under the Illinois Constitution but only under the federal constitution.

¶ 25    Keystone also replied in support of its motion for a preliminary injunction. Its motion was not futile because it was seeking not only to bar the Village from enforcing the Tax Agreement but for the court to declare the Tax Agreement illegal. Keystone had a clearly ascertained right under the Tax Code to apply for and receive an exemption. The Tax Agreement could not be terminated at any time as the Village argued because Keystone could terminate it only by ceasing to use the parcel as a school and ceasing to occupy the parcel, which would be burdensome. Even if Keystone received its exemption despite the Village's opposition, the Tax Agreement would impose "severe penalties" unless declared invalid. Keystone would suffer irreparable harm absent an injunction because relief from the Tax Agreement would allow Keystone to spend money it would otherwise spend on property taxes upon its other debts and would place Keystone in a better position regarding its foreclosure. As to the balancing of harms, the Village was not harmed. The parcel could have been used for a tax-exempt purpose other than a school as a special use under the Village zoning ordinance, and the criteria in the ordinance for approving special uses do not include property taxes. Also, the Village president

in 1998 had suggested the parcel to Keystone and then demanded Keystone waive its tax exemption. As Keystone had remodeled the parcel and opened its school by the time of the latter, Keystone "had no choice" but to comply with the Village's demands. Also, a contract that is against public policy is void even if not the result of coercion.

¶ 26　　The Village replied in support of its motion to dismiss. It argued that even constitutional rights can be waived, that Keystone's right to a tax exemption is merely statutory, and that a contract is not coerced merely by "hard bargaining" or the pressure of financial circumstances. It argued that there was no continuing violation of Keystone's rights for limitation purposes because the alleged harms to Keystone all arose from the agreements signed and the Permit issued in 1998, not any subsequent actions by the Village. The Village argued that the Tax Agreement and waiver of tax exemption were valid conditions for issuing the Permit so Keystone could not both operate a school under the Permit and violate its conditions. It argued that contract zoning is not illegal unless arbitrary and capricious but that Keystone had not pled facts sufficient to show that the Tax Agreement was arbitrary or capricious. For instance, it was speculative that another nonprofit tax-exempt entity would have been allowed to use the parcel without a similar exemption waiver. Lastly, Keystone's constitutional claims under counts II and V were disposed of by the federal court ruling because Illinois analyzes equal protection claims the same whether under the Illinois or United States Constitution.

¶ 27　　In September 2018, the court denied Keystone's motion for a preliminary injunction and the Village's motion to dismiss "except for the dismissal of attorney fees." The court found that a limitations defense does not bar a claim that a contract is void for being contrary to public policy.

¶ 28　　　　　　　　　　　　D. Answer and Counterclaims

¶ 29　　The Village answered the complaint and filed affirmative defenses. The Village denied or demanded strict proof of the allegations except to admit that copies of the Forbearance Agreement and Tax Agreement were correct and that the Village adopted the ordinance granting the Permit. Keystone purchased the parcel in December 1998 with tax-exempt bond financing and operated on the parcel since that time; Keystone requested in 2003 onward "to reduce its tax burden," and three private nonprofit schools operated in the Village and received a property tax exemption. The Village noted that it was not answering counts II or V of the complaint, as the federal district court had dismissed them.

¶ 30　　The first affirmative defense was limitations, specifically that Keystone and the Village entered into the Tax Agreement in November 1998 and contract-based claims have limitation periods of 10 years for breach of a written contract or 5 years for claims other than a breach of contract and that there is a limitation period of 90 days for zoning challenges. The second was *laches*, specifically that Keystone knew from when it entered into the Tax Agreement in 1998 that it could not apply for an exemption for the parcel as long as it was used for a school and that it knew of its alleged injuries from 2003 but did not exercise due diligence in bringing its complaint, which prejudiced the Village in that it did not pursue commercial uses for the parcel. The third was pursuant to the Local Governmental and Governmental Employees Tort Immunity Act (Immunity Act), specifically that a local government is not liable for an injury caused by (1) adopting or failing to adopt an enactment or (2) issuing or denying a permit, license, or similar authorization where the local government is authorized to determine whether the authorization is issued or denied. 745 ILCS 10/2-103, 2-104 (West 2018). The fourth was

failure to exhaust administrative remedies under the Tax Code by not filing for a property tax exemption from 1998 until it filed for an exemption in 2018.

¶ 31 The Village also filed counterclaims. It alleged that Keystone owned the parcel and operated a school there since September 1998, the parcel is in a commercial zone "C-1" where schools are not a permitted or special use, Keystone could not operate a school on the parcel without Village approval, and the Village approved the school by adopting the ordinance granting the Permit in November 1998. Keystone entered with the Village into the Forbearance Agreement in 1998 and the Tax Agreement in November 1998 "by its own free will and without coercion," the Village performed its obligations under both agreements, and Keystone benefited by both agreements. The Permit was issued with conditions including that Keystone abide by the Tax Agreement, and the Permit is void if Keystone violates any of those conditions. The Forbearance Agreement in relevant part required Keystone to obtain the Permit before occupying the parcel as a school after December 1, 1998, and to indemnify and hold harmless the Village from any action or judgment with the Village as a named party arising from or relating to Keystone using the parcel as a school. The Tax Agreement provided in relevant part that the parcel shall be subject to property taxes as long as Keystone owns or occupies it as a school, Keystone will not seek or accept a property tax exemption for the parcel, the Tax Agreement is a "material and significant factor" in the Village considering the Permit but does not require the Village to grant the Permit, and if the parcel becomes tax exempt the Permit may be declared void and Keystone would be obligated to pay Village $100,000 for each year with an exemption.

¶ 32 Count I of the counterclaims alleged breach of the Tax Agreement when Keystone stated in its complaint that it was terminating the Tax Agreement and when it filed for a tax exemption. Count I sought attorney fees and costs and a declaratory judgment and injunction that the Tax Agreement is valid, Keystone breached the Tax Agreement, Keystone was forbidden to pursue its application for a tax exemption or accept an exemption, and Keystone must withdraw its application. Count II alleged breach of the Tax Agreement and the conditions of the Permit and sought a similar declaratory judgment, injunction, attorney fees, and costs. Count III alleged breach of the indemnification clause in the Forbearance Agreement and sought attorney fees and costs and a declaratory judgment and injunction that the Forbearance Agreement was valid and that Keystone should indemnify the Village.

¶ 33 By leave of court in February 2019, the Village filed an additional counterclaim, that is, count IV, alleging Keystone violated the Permit. By statute, municipal zoning ordinances can establish standards for approving special uses and may subject approval of a special use upon conditions reasonably necessary to meet those standards. See 65 ILCS 5/11-13-1.1 (West 2018). The Village granted Keystone the Permit in November 1998 and amended it in January 2003 at Keystone's behest. One of the conditions in the Permit was entering into the Tax Agreement. Keystone operated a school on the parcel pursuant to the Permit for 20 years and thereby bound itself to accept the conditions of the Permit including the Tax Agreement, and it challenged the Tax Agreement but not the Permit. Keystone obtained a property tax exemption in December 2018 and thereby violated the Tax Agreement and the Permit. The Village sought to declare the Permit void and revoked, to order Keystone to cease operation of the school on the parcel from July 31, 2019, onwards, and to impose a fine of up to $750 daily for violating the Permit from Keystone's exemption application of March 28, 2018, onwards.

E. Answer to Counterclaims

¶ 35    Keystone answered the Village's counterclaims and affirmative defenses. Keystone admitted that it owned the parcel and operated a school there since September 1998 and that the parcel is in commercial zone "C-1" where schools are not a permitted or special use, but it added that other tax-exempt uses are permitted in the C-1 zone. Keystone maintained that it conformed to all zoning requirements when the Permit was issued but that "forfeiture of real estate tax exemption is not a zoning requirement." Keystone "may have had a constitutional right to zoning approval" for the parcel, and the students, parents, and faculty of Keystone's school "have civil liberties which outweigh zoning considerations." Keystone admitted signing the Forbearance Agreement and Tax Agreement but maintained that they incorporated documents by reference that the Village did not attach to its pleadings, and it denied that it signed either agreement by free will without coercion and that the Village had any clear obligations to perform under either agreement. Keystone maintained that waiving its right to a tax exemption was an unconstitutional and illegal condition of the Permit. Keystone argued that "the Village required it to file for [the] Permit after it had already moved into its property, made renovations, and started classes" and that "the illegality of the [Permit] derives from its violation of public policy not from the fact that it was coerced by the Village." Keystone denied each of the counts of the counterclaim insofar as its actions including applying for and receiving a tax exemption did not violate void or unlawful agreements and a void or unlawful Permit condition.

¶ 36    Keystone replied to the first affirmative defense of limitations that the federal district court decision was not binding on the circuit court, the affirmative defense was based on legal conclusions, Keystone was not raising only contract-related claims, and the court had already denied a limitation claim in denying the motion to dismiss. As to the second affirmative defense of *laches*, Keystone replied that it was based on legal conclusions and denied that it failed to act with due diligence or that the Village was prejudiced thereby. As to the third affirmative defense of the Immunity Act, Keystone replied that it was based on legal conclusions and maintained that the Immunity Act does not apply to contractual liability and damages. As to the fourth affirmative defense of failure to exhaust administrative remedies, Keystone replied that it did not apply for a property tax exemption until 2018 because of the provisions of the Tax Agreement.

¶ 37    F. Partial Summary Judgment for Keystone

¶ 38    Keystone filed a motion for partial summary judgment on counts I and III of its complaint in January 2019. Regarding count I, Keystone argued that the Tax Agreement was void *ab initio* as contrary to public policy, as expressed in the Illinois Constitution's authorization for property tax exemptions expressly including schools (Ill. Const. 1970, art. IX, § 6) and the Tax Code provision for a property tax exemption for schools (35 ILCS 200/15-35 (West 2018)). Courts in other states had addressed the strong public policy favoring tax exemptions for schools. In particular, a New Jersey case held that the public policy of property tax exemption for schools superseded a municipality's zoning authority. See *Society of the Holy Child Jesus v. City of Summit*, 13 A.3d 886 (N.J. Super. Ct. App. Div. 2011). Schools provide a public benefit and are granted a tax exemption to further that benefit, so that allowing a school to waive its right to an exemption is not like allowing a defendant to waive his personal right to a jury trial. Allowing a municipality to extract an exemption waiver negatively impacts the

vital Illinois constitutional principle of uniform taxation, as "it would make municipalities, not the State, the ultimate arbiters of what is or is not subject to property taxes."

¶ 39    Regarding count III on contract zoning, Keystone argued that the Tax Agreement was an abuse of legislative discretion. Illegal contract zoning occurs when a zoning decision is conditioned on collateral agreements whereby a local government barters its legislative discretion for benefits with no bearing on the merits of the zoning application at issue. The Tax Agreement as a condition of the Permit was exactly that, as Keystone's school on the parcel was found to be consistent with the zoning ordinance and yet the Village refused to grant the permit without the Tax Agreement and exemption waiver.

¶ 40    The Village responded to Keystone's partial summary judgment motion, arguing that nothing in the Tax Code provision for school exemptions prohibits a school from agreeing to waive its exemption. The Tax Agreement was supported by consideration, in that Keystone received the Permit to operate a school on the parcel in exchange for its waiver. The Village argued that Keystone was challenging the Tax Agreement due to its "dire financial situation" and that the Village had not exacerbated that situation but tried to ease by assisting Keystone with bond financing. Keystone's summary judgment motion rested on the assumption that Keystone is entitled to a property tax exemption, but its exemption application was still not final in that the exemption had been granted but the Village was challenging that decision. Keystone's motion cited cases from other states for the proposition that a tax exemption is unwaivable, but the Village argued that "Illinois courts have upheld the waiver of property tax exemptions made in contracts," citing *In re Application of Clark*, 80 Ill. App. 3d 1010 (1980). While the constitution and Tax Code provide for a property tax exemption for schools, the Village argued the right to contract is also a public policy, so that "a genuine legal question arises as to whether the [Tax] Agreement represents a violation of public policy such that it should be declared void *ab initio*" and "Keystone's right to summary judgment is not free and clear of doubt."

¶ 41    The Village argued that the Tax Agreement and Permit do not constitute improper contract zoning because a municipality can set standards for special uses and can reasonably condition its approval of a special use on compliance with those standards. Similarly, because the Tax Agreement was a condition for issuing the Permit and Keystone received the benefit of the Permit by operating a school on the parcel, it would be improper to allow Keystone to avoid the condition. By Keystone not asserting its claim that the Tax Agreement was improper until 20 years after signing it and 16 years after seeking to amend it, and by the Village relying on the Tax Agreement by (1) adhering to the Permit when a school on the parcel would otherwise violate the zoning ordinance and (2) assisting Keystone with bond financing (a copy of which was attached to the response), Keystone's claim should be barred under *laches*. Lastly, Keystone's claims should be barred under the five-year limitation period for claims arising under a contract but not alleging a defendant's breach of contract.

¶ 42    Keystone replied in support of its motion for partial summary judgment. It argued that its right to a tax exemption under Illinois law was clear, the right to contract is not absolute but subject to public policy, and the portions of *Clark* supporting the Village's argument are *dicta* so that Keystone can cite persuasive authority from other states. It argued that a municipality can place conditions on zoning or land use approval but not illegal conditions and that the necessity of the condition at issue for public health, safety, and welfare is belied by the fact

that tax-exempt uses other than schools are permitted on the parcel. Lastly, the court had already considered and rejected the Village's limitation and *laches* arguments.

¶ 43    In April 2019, the court granted Keystone summary judgment on count I, finding that the Tax Agreement violates public policy: specifically, the Tax Code provision for a property tax exemption for schools (35 ILCS 200/15-35 (West 2018)). The right being protected by that statute is a public right. "In the context of private schools, if those schools weren't there to provide education, then that burden would fall on government. The purpose of the statute is to promote education and availability of educational institutions in the community." Also, the court found, the "Village by requiring this *quid pro quo* is negotiating the rights of other taxing bodies of the county or in the community, which would include the county or the school districts," which "may very well be fully in favor of a tax exemption[ ] for the school because those taxes are viewed as a benefit obtained by another educational institution in the community to far outweigh whatever tax revenue those taxing districts may obtain if the property were taxable." The court did not reach count III, finding it moot in light of its decision on count I.

¶ 44                              G. Summary Judgment on Counterclaims

¶ 45    The Village filed two motions for summary judgment on its counterclaims, one based on its original counterclaims and a second addressing its additional counterclaim IV. It argued that there were no genuine issues of material fact because Keystone had acknowledged signing the Forbearance Agreement and Tax Agreement, which included recitations such as that Keystone's counsel and board read and approved the agreements and that Keystone president Shea made representations to the Village's development review board and board of trustees that Keystone would pay property taxes and not seek an exemption. In essence, Keystone admitted that it breached the Forbearance Agreement and Tax Agreement but argued that the Tax Agreement is illegal, but it is not illegal for the reasons the Village gave in response to Keystone's partial summary judgment motion. (That motion had not been decided when the Village filed this motion.) Also, even if the Tax Agreement were illegal in part, the Tax Agreement has a severability clause. Keystone was not challenging the validity of the Forbearance Agreement, so the court should enforce it against Keystone by requiring it to indemnify the Village. Keystone was also not challenging the validity of the Permit, which Keystone violated by seeking and receiving a property tax exemption and by bringing its action against the Village, so the court should declare the Permit void due to Keystone violating one of its conditions.

¶ 46    Keystone responded to the Village's motions, arguing that the court's decision on count I of Keystone's complaint rendered the Village's counterclaims moot. The Tax Agreement is void *ab initio* and cannot be enforced, and its severability clause does not save it because the aspect of the agreement found void—requiring Keystone to waive its exemption—is the purpose and object of the entire agreement. The Forbearance Agreement requires Keystone to indemnify the Village for claims regarding the parcel, but since the Tax Agreement violates public policy, it would also violate public policy to require Keystone to indemnify the Village regarding Keystone's challenge to the Tax Agreement.

¶ 47    The Village replied in support of its summary judgment motions, reiterating its argument that the severability clause in the Tax Agreement saves the portions thereof not found void by the court so that Keystone could still be found to have breached the Tax Agreement by using

the parcel as a school and the Village could receive the remedies specified in the Tax Agreement. Enforcing the Forbearance Agreement by requiring Keystone to indemnify the Village would not be against public policy because the Village would not be indemnified for any willful misconduct.

¶ 48 With leave of court, Keystone filed a cross-motion for summary judgment on the Village's counterclaims. It reiterated its arguments from its response to the Village's summary judgment motions that the severability clause in the Tax Agreement does not save it and that requiring indemnification regarding an agreement against public policy would itself be against public policy. It argued that it had challenged the validity of the Permit condition incorporating the Tax Agreement, though not the Permit generally, and that the court in finding the Tax Agreement void made a significant finding regarding the validity of that Permit condition. Zoning conditions are allowed in general, but illegal conditions are not, so the legality of the condition incorporating the Tax Agreement must be determined. Also, the Village cannot bind Keystone to recitations in the Tax Agreement, as it is void *ab initio*.

¶ 49 The Village responded to Keystone's cross-motion, reiterating its earlier arguments regarding severability and indemnification, that Keystone had never challenged the validity of the Permit, and that Keystone should be found to have violated the Permit.

¶ 50 In May 2019, the court denied the Village summary judgment on its counterclaims and granted Keystone summary judgment on the Village's counterclaims. The court found that the invalid portion of the Tax Agreement prohibiting Keystone from seeking or accepting a tax exemption was not severable from the rest of the agreement and thus the Tax Agreement is unenforceable. As to the Forbearance Agreement, it is against public policy to require Keystone to indemnify the Village against Keystone's own lawsuit challenging an agreement and Permit condition that are against public policy. "It would create a perverse incentive for parties to form contracts that violate public policy and dis-incentivize attempts to have those contracts declared unenforceable by the Court." As to count IV of the counterclaims regarding violation of the Permit, the court agreed with Keystone that the Permit condition incorporating the Tax Agreement is invalid so that Keystone did not violate the enforceable remainder of the Permit.

¶ 51 H. Unjust Enrichment & Judgment.

¶ 52 Also in May 2019, Keystone amended its complaint with leave of court to add an unjust enrichment claim, count VI of its amended complaint (though labeled count V). Keystone noted that the court had granted it partial summary judgment, declaring the Tax Agreement void as contrary to public policy. Keystone alleged that in the 10 years preceding its March 2018 complaint, "a substantial portion (about 30%) of the approximately $150,000 [in] taxes paid by Keystone was unlawfully exacted by the Village" and argued that the Village retaining the benefit of that tax revenue was unjust, inequitable, and unconscionable in light of the Tax Agreement being void. Count VI sought in relevant part "about $50,000 in illegally extracted real estate taxes," or more specifically "illegal tax payments from Keystone *** for that portion of real estate taxes [on the parcel] benefitting the Village paid by Keystone for the years 2007-2016."

¶ 53 The Village filed a motion to dismiss Keystone's unjust enrichment claim pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure. 735 ILCS 5/2-615, 2-619 (West 2018). The Village first argued that the claim was time-barred under the five-year limitation

statute (*id.* § 13-205) because Keystone knew the facts underlying its unjust enrichment claim since 1998. (The Village did not argue *laches* or that it was prejudiced by Keystone's delay in bringing suit.) The Village also argued that Keystone had adequate legal remedies so that unjust enrichment was inappropriate. Keystone could have applied earlier for a tax exemption, and the Village noted that Keystone applied for an exemption in 2018 before the court had declared the Tax Agreement void. Keystone also could have challenged the Permit condition in administrative review but did not. Lastly as to available remedies, Keystone could have terminated the Tax Agreement. The Village argued that Keystone made its property tax payments voluntarily; such payments cannot be recovered absent fraud, coercion, or mistake of fact; and unobscured facts when the underlying agreement is accessible do not constitute mistake of fact. The Village also argued that Keystone cannot be awarded damages for property taxes Keystone did not pay, as in 2016.

¶ 54    As to failure to state a claim upon which relief can be granted, the Village argued that an unjust enrichment claim exists when a defendant unjustly retains a benefit to the plaintiff's detriment and that retention violates the principles of justice, equity, and good conscience. It is insufficient that a party retained a benefit unless that retention was unjust. The Village argued that Keystone failed to establish that the Village had a duty to act or violated such a duty. Instead, the Village "upheld its end of the [Tax] Agreement for over twenty (20) years and continues to do so." A plaintiff seeking equitable restitution must show that it conferred some benefit on the other party and was denied compensation by no fault of its own, but Keystone received a benefit in that it could not have operated a school on the parcel without the Permit, for which the Tax Agreement was a condition.

¶ 55    Keystone responded to the Village's motion to dismiss. It argued that its unjust enrichment claim was not time-barred because the Village was citing the five-year limitation period and Keystone was not seeking return of its payments earlier than the preceding five years. It argued that cases cited by the Village for the proposition that unjust enrichment is unavailable when an adequate remedy at law exists were inapposite because they concerned the existence of a valid express contract, which did not exist here due to the Tax Agreement being void. While the Village did not assess property taxes on Keystone, it was retaining a benefit it would be inequitable for it to retain. The Village could not argue that Keystone had its remedy in applying for an exemption when it also argued that the Tax Agreement forbade it from—and imposed a significant penalty for—applying. Keystone did not pay its property taxes voluntarily because the voluntary payment rule applies to valid contracts rather than void ones and because the Village demanded the Tax Agreement as a condition of approving a school on the parcel when the school had already opened. Contrary to the Village's argument that Keystone did not establish its duty to act, Keystone argued that a local government always has the duty to not violate the law. Keystone had met all criteria for issuing the Permit, and the Permit should have been issued without the condition requiring the Tax Agreement. While the Village relies on tax revenue, tax-exempt uses other than schools were allowed on the parcel, so the "Village is therefore willing and able to [forgo] property tax revenue for certain uses and should have done so on an equal basis for the school" of Keystone.

¶ 56    The Village replied in support of its motion to dismiss. It argued that the five-year limitation should bar the unjust enrichment claim because Keystone was aware of its claim well before the five-year limitation period. It reiterated that Keystone had an adequate remedy at law because it could have challenged the Permit in administrative review but did not and

could have filed its exemption application earlier. The Village argued that Keystone paid property taxes voluntarily because it did not pay them under protest as it could have done, and it was not coerced into signing the Tax Agreement because it had the benefit of counsel and had the same information as the Village. The Village should not pay unjust enrichment when both Keystone and the Village benefited from the Tax Agreement and Permit for 20 years, and Keystone indeed benefited because the Permit would not have been issued and the school would not have been allowed on the parcel absent Keystone signing the Tax Agreement.

¶ 57 Keystone filed a motion for summary judgment on its unjust enrichment claim, arguing that, in light of the court's finding that the Tax Agreement was void as contrary to public policy, the "Village has retained, and still retains, years of illegal tax revenue." The purpose of the tax exemption for schools is to allow schools to spend money on education rather than property taxes, and it would be contrary to that purpose to allow the Village to retain the taxes paid by Keystone for the parcel. Similarly, if the Village was allowed to retain the tax revenue from the parcel, other local governments would be incentivized to demand conditions similar to the Tax Agreement and benefit from them until a court stopped them. Unjust enrichment can be awarded based on a contract found void as contrary to public policy such as the Tax Agreement. Keystone argued that it was not at equal fault because the Village required it to sign the Tax Agreement after it had remodeled the parcel and opened its school there and because it complied with all conditions of the Permit other than the Tax Agreement. Keystone argued that the Village should have to repay the money it received from the parcel for three of the preceding five years, Keystone not having paid property taxes for the latter two years. Keystone computed that to be $31,585.68 from the Village's line item on the parcel's tax bills.

¶ 58 On September 13, 2019, the court granted the Village's motion to dismiss the unjust enrichment count and dismissed counts III and IV of Keystone's complaint as moot.

¶ 59 III. ANALYSIS.

¶ 60 On appeal, the Village contends that the trial court erred in (1) determining that there were no genuine issues of material fact regarding Keystone's property tax status, (2) failing to determine that Keystone's complaint was barred by limitations and the doctrine of *laches*, (3) determining that the agreements were void as contrary to public policy, and (4) denying the Village's counterclaims. On cross-appeal, Keystone contends that (1) the trial court erred in dismissing or denying its unjust enrichment claim and (2) this court should sanction the Village for making frivolous or bad-faith arguments in its appellate brief.

¶ 61 A. Summary Judgments

¶ 62 The Village contends that the trial court erred in granting Keystone's summary judgment motions on count I of Keystone's complaint and on the Village's counterclaims. Specifically, the Village contends that the court erred in (1) determining that there were no genuine issues of material fact regarding Keystone's property tax status, (2) failing to determine that Keystone's complaint was barred by limitations and the doctrine of *laches*, (3) determining that the agreements were void as contrary to public policy, and (4) denying the Village's counterclaims. We shall first address the third point and then the others.

Both plaintiffs and defendants may file for summary judgment. 735 ILCS 5/2-1005(a), (b) (West 2018). It should be granted only where the pleadings, depositions, admissions, and affidavits on file show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Id.* § 2-1005(c). Summary judgment may be granted on the issue of liability although there is a remaining issue as to the amount of damages. *Id.* A genuine issue of material fact precluding summary judgment exists where material facts are disputed or reasonable persons may draw different inferences from undisputed facts. *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 15. Because summary judgment is a drastic means of disposing of litigation, it should be granted only where the movant's right is clear and free from doubt. *Id.* Therefore, we must construe the pleadings, depositions, admissions, and affidavits strictly against the movant. *Id.* We review *de novo* a grant of summary judgment. *Id.*

To establish a breach of contract, a plaintiff must prove (1) a valid and enforceable contract exists, (2) the plaintiff substantially performed the contract, (3) the defendant committed a breach of the contract, and (4) damages resulted. *Rocha v. FedEx Corp.*, 2020 IL App (1st) 190041, ¶ 95.

## 2. Public Policy

We consider the central point of contention in this case to be whether the requirement of the Tax Agreement, that Keystone not apply for or accept a tax exemption for the parcel so long as Keystone occupied it and used it as a school, was valid. Keystone sought to declare the requirement invalid, and the Village sought to enforce it. The trial court found that the requirement was void as contrary to public policy and refrained from addressing Keystone's other alleged grounds for finding it invalid, as its disposition of that claim was sufficient.

Illinois courts have traditionally upheld the right of parties to freely contract. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 64-65 (2006). Thus, a private contract or provision thereof will not be declared void as contrary to public policy unless it is clearly contrary to what the Illinois Constitution, statutes, or judicial decisions have declared to be public policy or it is clearly shown that the contract is manifestly injurious to the public welfare. *Id.* at 65. " ' "A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." ' " *1550 MP Road LLC v. Teamsters Local Union No. 700*, 2019 IL 123046, ¶ 33 (quoting *K. Miller Construction Co. v. McGinnis*, 238 Ill. 2d 284, 293 (2010), quoting Restatement (Second) of Contracts § 178 (1981)). The difference between a contract that is merely voidable and one that is void *ab initio* is that the former may be ratified and enforced by the obligor (though not by a wrongdoer), while the latter cannot. *Id.* ¶ 28; *Deutsche Bank National Trust Co. v. Hart*, 2016 IL App (3d) 150714, ¶ 41. A statute passed to protect the public cannot be rewritten by private contract because, in part, the members of the public protected by the statute are not and cannot be made parties to such a contract. *Jacobs v. Yellow Cab Affiliation, Inc.*, 2020 IL App (1st) 182462, ¶ 57. Whether a contract violates public policy is a question of law reviewed *de novo*. *1550 MP Road LLC*, 2019 IL 123046, ¶ 24.

The public policy cited by Keystone and relied upon by the trial court is found in our constitution and the Tax Code. The Illinois Constitution requires that, "[e]xcept as otherwise provided in this Section, taxes upon real property shall be levied uniformly by valuation

ascertained as the General Assembly shall provide by law." Ill. Const. 1970, art. IX, § 4(a). The exceptions in the section concern counties with a population over 200,000 and public easements. Ill. Const. 1970, art. IX, § 4(b), (c). As to exemptions, the "General Assembly by law may exempt from taxation only the property of the State, units of local government and school districts and property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes." Ill. Const. 1970, art. IX, § 6. The latter provision is implemented in the Tax Code, in relevant part section 15-35 providing that "all property of schools, not sold or leased or otherwise used with a view to profit, *is* exempt, whether owned by a resident or non-resident of this State or by a corporation incorporated in any state of the United States." (Emphasis added.) 35 ILCS 200/15-35 (West 2018).

¶ 70    We conclude from the aforesaid constitutional and statutory provisions that the requirement in the Tax Agreement that Keystone not apply for or accept a property tax exemption for the parcel despite having a school on the parcel is contrary to public policy. We recognize that none of these provisions expressly provide that an exemption is unwaivable and that courts in other states have found property tax exemptions waivable by agreement. See, *e.g.*, *City of Largo v. AHF-Bay Fund, LLC*, 215 So. 3d 10, 14-15 (Fla. 2017). However, we find the logic of the cases finding such exemptions unwaivable to be more persuasive.

¶ 71    In *Assessors of Dover v. Dominican Fathers Province of St. Joseph*, 137 N.E.2d 225, 228 (Mass. 1956), a

> "taxpayer applied for a variance to use the property for a combination church and residence. In so doing it committed itself intentionally to the proposition that this was to be the status of its property for tax purposes. The town, it is argued, accepted this statement at face value and granted the variance on the basis of it. This, it is argued, is in effect a contract which is binding on the taxpayer."

The Supreme Judicial Court of Massachusetts found that the negotiations for a variance were not a contract waiving the exemption.

> "But even if these negotiations could be tortured into a contract we are of opinion that it would not be valid. The zoning and taxing statutes are separate and distinct, and each is separately administered. A property owner may or may not be entitled to a variance. Many factors have to be considered. But those relating to the subject of taxation and exemptions have no relevancy. If a board of appeals upon consideration of the relevant factors concludes that a property owner is entitled to a variance it should grant it. It has no right in doing so to attach conditions by contract or otherwise touching the subject of taxes or exemptions. These are matters outside its jurisdiction. Moreover, what property is taxable and what is exempt is a subject covered by laws which are and must be general in their operation. They cannot be varied by a contract between the town and the taxpayer." *Id.* at 229.

The *Assessors of Dover* decision was unsuccessfully challenged several years later in *Town of Saugus v. Refuse Energy Systems Co.*, 448 N.E.2d 716, 719 (Mass. 1983), where,

> "despite clear authority prohibiting such contracts, the town presents several arguments in favor of the validity of the contractual provisions at issue. The town asserts that the Legislature has delegated the power to assess property to municipalities. Therefore, it argues, the town may contract with taxpayers to have them waive their right to challenge part of their assessment. The flaw in the town's argument is that an enforced waiver may allow municipalities to impose disproportionate tax burdens indirectly,

through the taxpayers' inability to challenge an assessment. In the case before us, the town's position could result in the company's paying taxes in excess of those required by law. The delegation of the power to assess does not negate general tax policies of the Commonwealth."

Notably, the town in *Town of Saugus* was delegated by Massachusetts law the power to assess property and nonetheless did not have the power to extract exemption agreements. The Village here has not been entrusted by Illinois law with the power to assess property for property tax purposes.

¶ 72      In *Town of Williston v. Pine Ridge School*, 321 A.2d 24, 28 (Vt. 1974), the Vermont Supreme Court found that a school did not waive or forfeit its property tax exemption by not timely complying with a statute establishing the procedure for challenging the validity of property tax exemptions because the "legislature could not have intended, when it enacted [that statute], that the procedural requirements that must be satisfied by contesting taxpayers must also be satisfied by those who have a good faith claim that they should not be taxpayers at all."

¶ 73      In *Society of the Holy Child Jesus*, a New Jersey appellate court noted that the purpose of statutory exemptions from taxation is the benefit conferred upon the public by religious, charitable, and other such institutions, including relief of the state's burden to care for its citizens. *Society of the Holy Child Jesus*, 13 A.3d at 891-92. The court found that

"targeting favorable tax treatment to specific property so as to achieve overall land use objectives is not, and never has been, the public policy behind the [tax exemption] Statute. Its purposes are served without any connection between a specific use and a specific piece of property. Rather, the broader goal of the Statute, as noted above, is to compensate the taxpayer for 'the contribution of the exempt facility to the public good.' [Citation.] Moreover, *** the Statute provides an exemption from real property taxes only if the public benefit is performed in a non-profit manner, *i.e.*, without private economic benefit to the taxpayer." *Id.* at 896 (quoting *Roman Catholic Diocese of Newark v. Borough of Ho-Ho-Kus*, 202 A.2d 161, 166 (N.J. 1964)).

While schools are subject to municipal zoning and land use ordinances, a municipality may not bar a school from within its boundaries or a zoning district thereof, nor deny a variance, solely because the tax exemption may be burdensome. *Id.* " '*Educational institutions *** are tax free as a matter of paramount State policy which cannot be thwarted by exclusionary zoning*.' " (Emphasis in original.) *Id.* (quoting *Township Committee of the Township of Denville v. Board of Education of the Vocational School in the County of Morris*, 279 A.2d 842, 846 (N.J. 1971)).

¶ 74      Here, while the Village at least arguably represents the residents or taxpayers of the Village for public policy purposes, it does not represent the public as embodied in other public bodies that receive property tax revenue, such as the county and the school districts. It certainly does not directly represent the State, nor its general citizenry, by whose authority the Tax Code exemption was enacted. However, the Village subsumed to—or usurped for—itself the power to decide whether Keystone would receive the exemption authorized by the Illinois Constitution and provided without express exception in the Tax Code. Similarly, Keystone could not waive that exemption through the Tax Agreement because it was not only Keystone's exemption to waive. The State extended the exemption to schools because of the benefits that schools, whether public or private, bring to the public. Forming an agreement with the Village

purporting to waive the exemption could cause harm beyond the harm to Keystone alone, as Keystone alleged in its complaint.

¶ 75    The Village contends that Illinois courts have held that a tax-exempt landowner can waive its exemption by agreement, citing *Clark* and *Northwest Suburban Fellowship, Inc. v. Department of Revenue*, 298 Ill. App. 3d 880 (1998). However, we find these cases inapposite and conclude that no Illinois court of review has held—as opposed to merely remarked in *dicta*—that a tax exemption can be waived by agreement.

¶ 76    *Clark* concerned property taxes in an agreement with a municipality concerning land use, in that case an annexation agreement, and specifically that the land in question " 'shall become as fully taxable as privately owned real estate.' " *Clark*, 80 Ill. App. 3d at 1011-12. The trial court found the landowner to be a charitable organization exempt from property taxation but found that the landowner owed property taxes due to the agreement. *Id.* at 1012. However, this court found that the "central question is whether Marian Park is a charitable organization and is therefore exempt from real estate taxation." *Id.* It then examined whether the landowner was a charitable organization and concluded that it was not. *Id.* at 1013. This court also rejected Marian Park's contention that the municipality had no authority to enter into the annexation agreement or to levy and collect property taxes and thus no standing. *Id.* at 1013-14. As to the latter, this court found that a "landowner's agreement that it will allow itself to be taxed, thereby impliedly waiving any possible exemption from taxation, does not appear to be unauthorized" and "Marian Park has accepted the benefits of the annexation agreement by accepting services provided by the [municipality] and is therefore not in a position to complain." *Id.* at 1014. This court also stated that the municipality

> "concedes that it has no authority to determine real estate tax liability for revenue purposes but urges that it does have the power to levy and collect taxes for corporate purposes. [Citation.] The distinction is sufficient in our view to undercut Marian Park's position, which basically relates to assessments and exempting property from taxation, *neither of which [the municipality] has done*." (Emphasis added.) *Id.*

Lastly, this court found the language of the annexation agreement to be clear and affirmed the judgment of the trial court "that the annexation agreement has waived the exemption." *Id.* at 1015.

¶ 77    We consider *Clark* inapposite for two reasons. First and foremost, the appellate court found the landowner to not be a charitable organization, so that its consideration of the validity of an implicit waiver of an exemption *it had just found to not exist* was *obiter dicta*. The second arises from the first: because the heart of the appellate court's analysis was whether the landowner had a charitable organization exemption at all, its analysis of the municipality's authority was less than rigorous. While it found that the landowner had waived the exemption, it also found that the municipality had not acted regarding exempting property from taxation. In stark contrast, the Village here did exactly that, so we have been presented squarely with the issue the *Clark* court was not squarely or directly presented.

¶ 78    *Northwest Suburban Fellowship* is also inapposite. The appellate court therein cited *Clark* for the proposition that an agreement can waive the right to a property tax exemption. *Northwest Suburban Fellowship*, 298 Ill. App. 3d at 887. However, it found the lease provision therein ambiguous, unlike the annexation agreement in *Clark*, and thus found that the lease did not constitute an exemption waiver. *Id.* at 886-87. Therefore, to the extent the *Northwest Suburban Fellowship* court cited *Clark* favorably, it also cited it in *dicta*.

3. The Village's Other Contentions

¶ 80    All the other decisions of the trial court challenged by the Village either preface or arise from the decision that the Tax Agreement provision requiring Keystone to waive its property tax exemption is void as contrary to public policy.

¶ 81    The Village contends that the trial court erred in determining that there were no genuine issues of material fact regarding Keystone's property tax status. However, the Tax Code is clear that real property of a school is tax-exempt. 35 ILCS 200/15-35 (West 2018). The Village does not question that Keystone operates a school on the parcel; indeed, that is a key fact of its counterclaims. From the proceedings on Keystone's tax exemption application, to the extent they have been included in this record, two things are apparent. First, the Department of Revenue granted Keystone's exemption before the court ruled on Keystone's partial summary judgment motion and found the Tax Agreement void. Second, the only reason why Keystone had to appeal its application to the Department of Revenue is because the Village interposed the Tax Agreement. The ruling reversed by the Department of Revenue stated that Keystone "ordinarily would qualify for an exemption as a school" but that "the evidence in the record is that a valid and enforceable agreement exists between the parties that [Keystone] will not seek an exemption." We find that the court was free at that point to determine as a matter of law that the latter was incorrect.

¶ 82    The Village contends that the trial court erred in finding the entire Tax Agreement void and unenforceable. The court did so due to the Tax Agreement provision requiring Keystone to waive its property tax exemption, finding that the severability clause (paragraph 13) of the Tax Agreement did not save it.

¶ 83    In determining whether it is appropriate to sever an unconscionable provision from an agreement and enforce the remainder of the agreement, Illinois courts consider whether the provisions operate independently of each other or whether the provisions not found invalid are so closely connected with the unenforceable provisions that to sever the unenforceable provisions and enforce the remainder of the agreement would be essentially rewriting the agreement. *Tortoriello v. Gerald Nissan of North Aurora, Inc.*, 379 Ill. App. 3d 214, 238 (2008). Similarly, a contract is not divisible or severable if the parties assented to all the promises as a single whole so that there would have been no agreement at all if any promise or set of promises were struck out. *Bjork v. Draper*, 381 Ill. App. 3d 528, 544 (2008).

¶ 84    We agree with the trial court that the purpose and function of the Tax Agreement is to implement the unenforceable provision, paragraph 2 thereof, and thus the voidness of the unenforceable provision renders the entire Tax Agreement void. One provision of the Tax Agreement (paragraph 5) provides that, "[i]n the event Keystone obtains an order invalidating *any* part of this agreement, the Village shall have all the rights granted it in" the damages clause. (Emphasis added.) That damages clause (paragraph 7) explicitly exists to enforce the unenforceable provision, as it provides that, "[i]n the event that the [parcel] becomes tax exempt in whole or part, for whatever reason, Keystone shall be in breach of this agreement, and the Village shall have and may pursue one of the following rights and remedies." Similarly, the purpose of the clause (paragraph 8) purporting to limit or waive Keystone's ability to contest the Tax Agreement in court is to expedite the Village seeking those remedies from Keystone. The only provision of the Tax Agreement not in furtherance of the unenforceable provision is the clause (paragraph 4) allowing Keystone to seek a reduction in assessed valuation, after giving the Village notice of its intent to do so, in which the Village agrees to

"not object to Keystone seeking an assessed valuation based solely upon its not-for-profit status, provided the premises remain taxable." However, the Tax Agreement would not have to carve out an exception to the purported exemption waiver in the unenforceable provision for mere appeals of assessed valuation if the purported waiver did not exist.

¶ 85　　The trial court having correctly concluded that the Tax Agreement as a whole was void and unenforceable, summary judgment for Keystone on the Village's counterclaim to enforce the Tax Agreement naturally follows. A contract that is void *ab initio* is treated as though it never existed and cannot be enforced by either party. *1550 MP Road LLC*, 2019 IL 123046, ¶ 43.

¶ 86　　The court similarly did not err in granting summary judgment for Keystone on the Village's counterclaim to enforce the Permit. The sum and total of the relevant condition in the Permit is that Keystone "enters into the attached [Tax Agreement] and continues to abide by said agreement." As the Tax Agreement is void and unenforceable, granting the Village summary judgment to enforce the Permit—that is, the Permit condition incorporating the Tax Agreement, there being no allegation that Keystone has otherwise violated the Permit—would effectively be enforcing the unenforceable Tax Agreement.

¶ 87　　The court also found indemnification under the Forbearance Agreement to be contrary to public policy because requiring Keystone to indemnify the Village for Keystone's successful challenge to the Tax Agreement as against public policy would itself be contrary to public policy. We agree. As stated above, a promise or other term of an agreement is unenforceable on grounds of public policy if the interest in its enforcement is clearly outweighed in the circumstances by a public policy against enforcement of such terms. *Id.* ¶ 33. While the Forbearance Agreement as a whole is not invalid or unenforceable, under the circumstances of Keystone successfully suing the Village to have the Tax Agreement found void and unenforceable, requiring Keystone to indemnify the Village for Keystone's successful suit would have the chilling effect of discouraging parties from bringing legal challenges to agreements that are contrary to public policy.

¶ 88　　Lastly, the Village contends that the trial court erred by failing to determine that Keystone's complaint was barred by limitations and the doctrine of *laches*.

¶ 89　　It is axiomatic that statutes that are unconstitutional on their face are void *ab initio* and that they and court orders void *ab initio* may be challenged at any time in any court with jurisdiction. *People v. Thompson*, 2015 IL 118151, ¶¶ 31-32. It is also axiomatic that statutes of limitation applicable to common-law claims, as opposed to statutory claims, are not jurisdictional. *Doe A. v. Diocese of Dallas*, 234 Ill. 2d 393, 413 (2009); *Mercury Sightseeing Boats, Inc. v. County of Cook*, 2019 IL App (1st) 180439, ¶¶ 65-66. We see no error in the trial court's conclusion that a claim that a contract or agreement is void *ab initio* is not barred by the five-year statute of limitations. See 735 ILCS 5/13-205 (West 2018).

¶ 90　　The Village also contends that Keystone's complaint is untimely under a 90-day limitation period for challenges to municipal zoning decisions. The Illinois Municipal Code provides in relevant part that:

> "Any decision by the corporate authorities of any municipality, home rule or non-home rule, in regard to any petition or application for a special use, variance, rezoning, or other amendment to a zoning ordinance shall be subject to *de novo* judicial review as a legislative decision, regardless of whether the process in relation thereto is considered administrative for other purposes. Any action seeking the judicial review of such a

decision shall be commenced not later than 90 days after the date of the decision." 65 ILCS 5/11-13-25(a) (West 2018).

However, a federal court faced with constitutional challenges to a municipal land use decision found that limitation provision inapplicable.

> "The claims in this action are brought *independent* of the Illinois Municipal Code review framework. Plaintiffs target the alleged deprivation of federal constitutional rights (via the procedural vehicle of 42 U.S.C. § 1983) and of rights under the Illinois Constitution (as state-law claims over which this Court has supplemental jurisdiction). In Illinois, the statute of limitations for most federal constitutional claims, asserted via § 1983, is two years. [Citation.] In its reply brief, the Village concedes that this two-year limitations period applies, yet nonetheless asserts that the case cannot be 'broaden[ed] *** into a judicial review of the Village's denial of relief.' [Citation.] But Plaintiffs did not and have not asked for judicial review of the Village Council's refusal to amend the ordinance or the Zoning Board's rejection of the variances (the Zoning Board decision would be reviewed by a state court). Rather, Plaintiffs seek a declaration as to the constitutionality of the sign restrictions. Seeking that declaration is not the same as seeking judicial review of the Zoning Board under the Illinois Municipal Code, and is a request for relief against an alleged ongoing harm." (Emphasis in original.) *Peterson v. Village of Downers Grove*, 103 F. Supp. 3d 918, 924 (N.D. Ill. 2015).

We find this decision highly persuasive. Keystone similarly raised constitutional and public policy claims[1] and was not seeking judicial review of the Permit but a declaration as to the validity of the Tax Agreement and relief from an alleged ongoing harm.

¶ 91    We lastly come to *laches*, which is an equitable affirmative defense requiring the party raising it to show (1) an unreasonable delay in bringing an action and (2) that the delay caused prejudice. *Ocwen Loan Servicing, LLC v. DeGomez*, 2020 IL App (2d) 190774, ¶ 25. While void judgments can be challenged at any time, at least one district of this court has held that *laches* may preclude relief in appropriate cases where prejudice is demonstrated. See *id.*

¶ 92    We cannot see how the Village has been prejudiced by Keystone not bringing its suit challenging the Tax Agreement for about 20 years. Indeed, to the extent that delay meant Keystone was not taking its exemption but paying property taxes, the Village arguably profited by the delay rather than being prejudiced by it. To the extent that the Village has not paid property taxes when billed for them, the Village has been no worse off than if Keystone filed its lawsuit or its exemption application years ago.

¶ 93    In sum, we find that the trial court did not err in granting summary judgment for Keystone on count I of its complaint or upon the Village's counterclaims.

¶ 94                              B. Unjust Enrichment

¶ 95    Keystone contends that the trial court erred in dismissing its unjust enrichment claim.

¶ 96    We note before proceeding to the merits that the record does not include a transcript or equivalent record (Ill. S. Ct. R. 323 (eff. July 1, 2017)) for the hearing of September 13, 2019,

---

[1]The federal court on removal dismissed certain counts of Keystone's complaint under the federal constitution but did not address the Illinois Constitution. The circuit court did not reach them, as it found for Keystone on its public policy claim and found other counts of Keystone's complaint moot.

- 22 -

where the court dismissed Keystone's count VI or unjust enrichment claim. The appellant—here, Keystone—has the burden of presenting a sufficiently complete record to support its claim of error, and any doubts that arise from an incomplete record will be resolved against the appellant. *In re Linda B.*, 2017 IL 119392, ¶ 43.

¶ 97 A pleading or portion thereof may be dismissed pursuant to section 2-615 or 2-619. 735 ILCS 5/2-615(a), 2-619(a), (b) (West 2018). A section 2-615 motion challenges the legal sufficiency of a pleading by alleging defects on its face. *Rehfield v. Diocese of Joliet*, 2021 IL 125656, ¶ 20. A cause of action should not be dismissed under section 2-615 unless it is clearly apparent that no set of facts can be proved that would entitle the claimant to recovery. *Id.* A section 2-619 motion admits the legal sufficiency of the pleading but raises a defense that allegedly defeats it. *Id.* ¶ 21. In reviewing the disposition of a section 2-619 motion, the key issue is whether the existence of a genuine issue of material fact should have precluded dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law. *Id.* ¶ 23. On review of the disposition of a section 2-615 or 2-619 motion, we accept as true all well-pled facts and all reasonable inferences that may be drawn from them, and we construe the allegations in a complaint or counterclaim in the light most favorable to the claimant. *Id.* ¶¶ 20, 22. We review *de novo* a dismissal under section 2-615 or 2-619. *Id.* ¶ 23. Therefore, we may affirm a dismissal on any basis supported by the record, and our disposition is without regard to the trial court's reasoning. *Masters v. Murphy*, 2020 IL App (1st) 190908, ¶ 9.

¶ 98 To prevail on a claim for unjust enrichment, a plaintiff must show that the defendant retained a benefit to the plaintiff's detriment and that the retention violates fundamental principles of justice, equity, and good conscience. *Hatcher v. Hatcher*, 2020 IL App (3d) 180096, ¶ 15. Unjust enrichment is an equitable remedy based upon a contract implied in law, available only when no express contract governs the parties' relationship and there is no adequate remedy at law. *First Midwest Bank v. Cobo*, 2017 IL App (1st) 170872, ¶ 29, *aff'd on other grounds*, 2018 IL 123038.

¶ 99 Here, we find that the court did not err in dismissing Keystone's unjust enrichment claim. As stated above, unjust enrichment is unavailable as a remedy when an adequate legal remedy exists. We agree with the Village that Keystone could have applied for a property tax exemption under the Tax Code earlier than it did, which would have rendered it free of property taxes earlier. We consider it significant that Keystone applied for and received its exemption before the trial court had declared the Tax Agreement void as contrary to public policy. In sum, Keystone had an adequate remedy at law under the Tax Code. Therefore, Keystone could not state a claim of unjust enrichment upon which relief could be granted.

¶ 100 There is another reason apparent on the record for the trial court to dismiss the unjust enrichment claim: *laches*. The Village did not raise a *laches* claim in its motion to dismiss the unjust enrichment claim or reply in support of that motion. However, the dismissal order did not specify why the court granted dismissal, and as stated above we do not have a transcript or similar record for the dismissal hearing. Thus, the possibility exists that the Village raised a *laches* claim—which it had raised in earlier motions—in orally arguing its dismissal motion.

¶ 101 While we addressed *laches* above, our analysis of *laches* changes when looking not at Keystone's initial complaint seeking a declaratory judgment and injunctive relief but its amended complaint also seeking damages for unjust enrichment. Keystone unreasonably delayed bringing a judicial challenge to the Tax Agreement by not suing for nearly 20 years, knowing when it signed the Tax Agreement in 1998 that it was purportedly waiving its property

- 23 -

tax exemption. Moreover, the Village was prejudiced thereby in that its property tax revenue from Keystone added up for all those years in which Keystone paid property tax on the parcel. Stated another way, the trial court could correctly conclude on this record that Keystone allowed its damages for unjust enrichment to accumulate for all those years to the Village's detriment.

¶ 102                                C. Sanctions

¶ 103    Lastly, Keystone contends that this court should sanction the Village for making frivolous or bad-faith arguments in its appellate brief by contending on appeal that the Tax Agreement is valid and enforceable. Keystone initially cited Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018), but after the Village noted that Rule 137 applies to filings in the circuit court, Keystone now contends that sanctions are appropriate under Illinois Supreme Court Rule 375 (eff. Feb. 1, 1994).

¶ 104    Rule 375 governs sanctions for failure to comply with the rules governing appeals and for filing frivolous appeals. It provides in relevant part that:

> "If, after consideration of an appeal or other action pursued in a reviewing court, it is determined that the appeal or other action itself is frivolous, or that an appeal or other action was not taken in good faith, for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation, or the manner of prosecuting or defending the appeal or other action is for such purpose, an appropriate sanction may be imposed upon any party or the attorney or attorneys of the party or parties. An appeal or other action will be deemed frivolous where it is not reasonably well grounded in fact and not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law. An appeal or other action will be deemed to have been taken or prosecuted for an improper purpose where the primary purpose of the appeal or other action is to delay, harass, or cause needless expense." Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994).

¶ 105    We find that the Village did not make a frivolous or bad-faith argument in contending that the Tax Agreement is valid, and thus Keystone's request for sanctions is denied. Whether the Tax Agreement was valid and enforceable, or void *ab initio* as the circuit court found, depends on whether the right of a school to a property tax exemption can be waived by agreement. No Illinois constitutional provision or statute *expressly* provides that said right is unwaivable. The fact that courts in other states have found property tax exemptions waivable by agreement supports a good-faith argument that the Tax Agreement was valid. Similarly, though we ultimately found them inapposite, this court's decisions in *Clark* and *Northwest Suburban Fellowship* also support a good-faith argument that a property tax exemption is waivable by agreement under Illinois law.

¶ 106                              IV. CONCLUSION.

¶ 107    Accordingly, we affirm the judgment of the circuit court.

¶ 108    Affirmed.